statement from al-Haramain chairman, Aqeel al-Aqeel, who declared that the charity maintained accounts at al Baraka Bank in Saudi Arabia.

50.    Al Baraka Investment & Development is mostly present in the Sudanese banking sector, through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank and Tadamon Islamic Bank. Al Baraka is also affiliated with the National Development Bank in Sudan.

51.    Defendant Saleh Abdullah Kamel was born in Makkah, Saudi Arabia, in 1941. After being the adviser to the Saudi Minister of Finance, in 1969 he founded Dallah Albaraka Group LLC, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

52.    Dallah Albaraka Group LLC, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services and financial activities. The group includes twenty-three banks in Arab and Islamic countries, in addition to several investment and financial companies.

53.    Dallah Albaraka Group LLC's portfolio includes a wholly owned subsidiary specializing in aviation-services, Dallah Avco Trans-Arabia Co Ltd. The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

54.    Two of the hijackers on September 11, 2001, of American Airlines Flight 77, Nawaf al Hazmi and Khalid al Mihdhar, received funding from Omar al Bayoumi (a/k/a Abu Imard), a Saudi national who paid their house rent in San Diego. Omar al Bayoumi is listed as a suspect wanted by the FBI in connection with the September 11, 2001 attacks.

55.    Omar al Bayoumi was Assistant to the Director of Finance for an al Baraka company, Dallah Avco, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998.

56.     On May 5, 1998, Omar Al Bayoumi registered a fictitious company name called Masjed al Madinah al Munawarah (a/k/a Masjid al Madinah al Munawarah) based in San Diego, California. In March 25, 1999 a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawwarah, Inc.

57.     Dallah Albaraka Group LLC's financial arm is al Baraka Investment & Development (or "ABID"), a wholly owned subsidiary based in Jeddah, Saudi Arabia.

58.     Saleh Abdullah Kamel, Chairman of Dallah al Baraka and al Baraka Bank, was one of the three founding members of Al Shamal Islamic Bank. Saleh Abdullah Kamel founded the bank in 1983, along with a Sudanese company, Al Shamal Investment and Development, and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan al-Turabi.

59.     The practice and policy of Dallah Albaraka Group LLC and al Baraka Bank is to provide financial support and material assistance to international terrorist organizations including al Qaeda.

60.     In 1998, al Aqsa Islamic Bank was established with $20 million in capital. The main shareholders were Dallah al Baraka Group LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a Dallah al-Baraka LLC subsidiary, owns 14 percent of al-Aqsa Islamic Bank. Saleh Abdullah Kamel acknowledged that Dallah al-Baraka Group LLC owns another twelve percent directly.

61.     Since 1998, Israel has refused to approve the bank, citing its obvious ties with known terrorists. At the beginning of 2001, several antiterrorist authorities from Israel visited Citibank's headquarters in New York to warn its directors of the nature of the bank's activities with respect to international terrorism.

62.     Al Baraka provided support to the "charity" al-Haramain operations and helped transfer funds for Osama bin Laden operations, as reported by the Bosnian Intelligence Agency

(Agency for Investigation and Documentation -- AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FbiH)":

> Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey.   The amount is 1,059,687 DEM [$2.13 million].

63.     Al Baraka Turkish Finance House, an al Baraka branch in Turkey, is a subsidiary of Dallah al Baraka Group LLC.

64.     A Bosnian Intelligence memo regarding the activities of al-Haramain states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover . . .

65.     The report establishes al-Haramain's role in financing and assisting Osama bin Laden's operations.

> [t]he Saudi HO [Humanitarian Organization] al-Haramain, . . . has acted as a channel for financing the activites of terrorist organizations.   . . . According to available intelligence, the Sarajevo office assisted the terrorist organization Gama al Islamija, while members of bin Laden's el Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.

66.     Additional allegations regarding the charity Defendant al-Haramain are detailed below.

## Al Shamal Islamic Bank

67.     Al Shamal Islamic Bank was formed in the Republic of Sudan (or "Defendant Sudan" or "Sudan") on April 1983, and started operations on January 2, 1990, with a paid capital of $3.9 million.  Shares were issued between 1997 and 2000.  In or about the same year of the

bank's formation, Osama bin Laden moved several of his Saudi businesses and assets, or extended the reach of these businesses and assets, into the Republic of Sudan (or "Sudan").

68.    A United States' State Department fact sheet on Osama bin Laden, dated August 14, 1996, notes Osama bin Laden's operations in Sudan since 1983: "In a 1994 interview, Bin Ladin claimed to have surveyed business and agricultural investment opportunities in Sudan as early as 1983."

69.    In 1989, Hassan al Turabi installed a radical extremist Islamic government in Sudan through a *coup*. In 1991, Osama bin Laden settled in Sudan, by invitation of Hassan al Turabi and the Sudanese government. A 1996 State Department fact sheet on Osama bin Laden described his operations in the country beginning in 1991:

> Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi. (...) [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Ladin also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

70.    Osama bin Laden's close relationship with the new extremist Sudanese regime became symbiotic and he conducted several business projects with or on behalf of the NIF. One of these investments was the Al Shamal Islamic Bank, as reported by the State Department:

> Bin Ladin and wealthy NIF members capitalized al-Shamal Islamic Bank in Khartoum. Bin Ladin invested $50 million in the bank.

71.    Osama bin Laden's involvement in business transactions in Sudan including the Al Shamal Islamic Bank was confirmed by a 2002 Congressional Research Service Report:

> In 1991, bin Laden relocated to Sudan with the approval of Sudan National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help Sudan build roads and airport facilities. The business in Sudan (...) enabled him to offer safe haven and employment in Sudan to al Qaeda members, promoting their

involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-U.S. terrorism.

72.     Al Shamal Islamic Bank was founded in 1983 by three individuals or entities: (1) Al Shamal for Investment and Development, a Sudanese company; (2) Defendant Saleh Abdullah Kamel, Chairman of the Saudi Dallah al Baraka Group LLC; and (3) the Sudanese Government of Northern State, then controlled by Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, and representative of extremist Hassan al-Turabi.

73.     In April 1984, the Al Shamal Bank issued shares to its main founders. They included the Government of Northern State, the Defendant Faisal Islamic Bank – Sudan, Defendant Saleh Abdullah Kamel, his brother Omar Abdullah Kamel, and Defendant al Baraka Investment and Development (ABID), a wholly owned subsidiary of Dallah al Baraka Group LLC and Defendant Saleh Abdullah Kamel.

74.     Among the shareholders of the Al Shamal Bank was Defendant Faisal Islamic Bank – Sudan, a subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC, whose parent company is Defendant Dar-al-Maal al Islami (DMI), based in Switzerland. The three entities are chaired by Defendant Mohammed al Faisal al Saud, and controlled by Saudi investors.

75.     Al Shamal Islamic Bank Chairman and shareholder, Defendant Adel Abdul Jalil Batterjee, is the Chairman of al-Bir Saudi Organization, whose United States branch, Benevolence International Foundation (or "BIF"), is also a front for al Qaeda sponsorship.

76.     Defendant Adel Abdul Jalil Batterjee is both Chairman of the Al Shamal Islamic Bank and was also Chairman of the World Assembly of Muslim Youth. Batterjee is the subject of an FBI investigation for terrorist activities and is implicated in the criminal indictment of Enaam Mahmoud Arnaout of BIF.

341

77.    Al Shamal Islamic Bank General Manager, Mohammad S. Mohammad, acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 in the name of al-Hijrah Construction and Development Ltd. This company, according to the United States Department of State, worked directly with Sudanese military officials to transport and provide provisions to terrorists training in Osama bin Laden's terrorist training camps in northern Sudan.

78.    A third Al Shamal Bank account was opened in 1993 in the name of Osama bin Laden's company, Wadi al Aqiq, a company registered in Saudi Arabia. The import-export firm, in conjunction with Osama bin Laden's Taba Investment Company Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members.

79.    Al Shamal Bank has repeatedly been used to fund criminal and terrorist activities. A former associate of Osama bin Laden, Jamal Ahmed al-Fadl, testified during the United States trial on the 1998 embassy bombings in Africa, that Osama bin Laden and at least six al Qaeda operatives held bank accounts in Al Shamal Islamic Bank under their real names.

> Q. While you were in the Sudan, did you handle money for Osama bin Laden?
> A. Could you repeat the question.
> Q. Did you work on the finances for al Qaeda while you were in the Sudan?
> A. Yes.
> Q. Did you know where the bank accounts of Osama bin Laden and al Qaeda were?
> A. Yes.
> Q. Do you know whose names they were in?
> A. The bank account under Osama bin Laden in Bank Shaml [al Shamal Islamic Bank], Khartoum.
> Q. That was under Osama bin Laden's true name?
> A. Yes.
> Q. Were there accounts in other names?
> A. Yes. Afad Makkee got account also.
> Q. Afad Makkee, the account that he had under his name, do you know what name that is?
> A. I remember Madani Sidi al Tayyib.

342

Q. Do you know of any other persons who had al Qaeda money in their accounts?
A. Abu Rida al Suri.
Q. Do you know his true name?
A. Nidal
Q. Anyone else that you knew had al Qaeda money in bank accounts in their name?
A. Abu Hajer al Iraqi.
Q. Do you know his true name?
A. Mamdouh Salim.
Q. Did you have any accounts in your name?
A. Shared with Abu Fadhl.
Q. So you had accounts in your name that were shared with Abu Fadhl?
A. Yes.
Q. Do you recall anyone else that had bank accounts in their name for al Qaeda?
A. Abdouh al Mukhlafi.

80.    Jamal Ahmed al-Fadl also testified that al Qaeda operatives received monthly

checks of several hundred dollars from Al Shamal Islamic Bank accounts:

Q. When you worked for Osama bin Laden, in the Sudan, how much were you paid?
A. $1,200 . . . per month.
Q. For how long did you work for him?
A. Almost two years.
Q. What banks did he keep his money at?
A. Bank el Shamar [Al Shamal Islamic Bank].
Q. Any other banks?
A. I think he had accounts in different banks, but I only recall Bank Shamar [al Shamal Islamic Bank].

81.    Jamal Ahmed al-Fadl also testified that he transferred $100,000.00 from Al

Shamal Islamic Bank to an al Qaeda representative in Jordan:

Q. How did you carry the $100,000?
A. In my bag with my clothes.
Q. Do you recall what kind of bills the $100,000 was in?
A. I remember they all hundred bill.
Q. Sorry?
A. They all hundred bill.
Q. They were all hundred dollar bills?
A. Yes.
Q. Who gave you the money?
A. Abu Fadhl, he bring it from Shamal Bank [al Shamal Islamic Bank] and he bring it to me.

343

Q. Abu Fadhl brought it from the Shamal Bank [al Shamal Islamic Bank]?
A. Yes.

82.    During the course of the same trial, another associate of Defendant Osama bin Laden, Essam al Ridi, testified that the Al Shamal Bank was used for al Qaeda operational purposes, stating that "$250,000 was wired from Al Shamal Islamic Bank" in 1993 via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden . . . intended to transport Stinger missiles. . . ." in 1993.

83.    Following September 11, 2001, the Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee testified that Defendant Al Shamal Islamic Bank operations continue to finance and materially support international terrorism and that there are indications that Osama bin Laden remains the leading shareholder of that bank.

## Al-Rajhi Banking and Investment Corporation

84.    Officially founded in 1987, Defendant al-Rajhi Banking & Investment Corporation, (or "al-Rajhi Bank") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries across the world.  Defendant Sulaiman Abdulaziz al-Rajhi is the Managing Director of al-Rajhi Banking & Investment Corporation and Defendant Saleh Abdulaziz al-Rajhi is the Chairman.

85.    The al-Rajhi Banking & Investment Corporation is the primary bank for a number of charities that serve as al Qaeda front groups.  Al-Haramain Islamic Foundation, the Muslim World League, and the International Islamic Relief Organization all funnel terrorism financing and support through the al-Rajhi Banking & Investment Corporation financial system.  One of the hijackers in the September 11, 2001 attack, Abdulaziz al-Omari, who was aboard American Airlines Flight 11, held an account with al-Rajhi Banking & Investment Corporation.

86.    Defendant Sulaiman Abdul Aziz al-Rajhi has a history of financially supporting al Qaeda terrorists. Sulaiman Abdul Aziz al-Rajhi managed the National Commercial Bank budget of the Saudi Joint Relief Committee.  The al-Rajhi family is also the primary financier of the SAAR Foundation Network and, as such, is implicated by the SAAR Network's sponsorship of terrorism and Osama bin Laden.  Saleh Abdulaziz al-Rajhi has been closely linked to Osama bin Laden's personal secretary and convicted terrorist, Wadih el-Hage.  When the Kenyan house of Osama bin Laden's personal secretary, Wadih el-Hage, was raided in 1997, information regarding Saleh Abdulaziz al-Rajhi was discovered.  Wadih el-Hage is a known al Qaeda member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

87.    Co-conspirators, agents, aiders and abettors of the al-Rajhi banking scheme to fund or otherwise materially support terrorism include:  Sulaiman Abdul Aziz al-Rajhi, Saleh al-Rajhi, Abdullah Sulaiman al-Rajhi, and Khalid Sulaiman al-Rajhi.  All of these Defendants do business in and have a significant business presence in the United States, including but not limited to, through al-Watania Poultry, one of the World's largest poultry businesses, and through Defendants Mar-Jac Poultry, Inc., Mar-Jac Investments, Inc. and Piedmont Poultry. They are also material sponsors of international terrorism.

## National Commercial Bank

88.    The National Commercial Bank (or "NCB") was founded in 1950 by Salim bin Mahfouz.  Defendant Khalid bin Salim bin Mahfouz was born in Hadramaut, Yemen, on September 12, 1928.  Khalid bin Salim bin Mahfouz is the son of Salim bin Mahfouz, who emigrated to Saudi Arabia in or about 1930.  The National Commercial Bank was the first commercial bank of Saudi Arabia, based in Jeddah.  After Salim bin Mahfouz's death in 1986, his son Khalid bin Mahfouz became President and CEO of the National Commercial Bank and remained in that position until 1999, becoming its principal shareholder with control over more

than 50% of the bank's capital. The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise.

89.     The National Commercial Bank was implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce International (or "BCCI"). NCB Chairman Khalid bin Salim bin Mahfouz became Chief Operating Officer and major shareholder of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of National Commercial Bank in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. The National Commercial Bank was used by Osama bin Laden and al Qaeda as a financial arm, operating as a financial conduit for Osama bin Laden's operations. As a former CIA counter-terrorism expert explained in October 2001:

> How does the al Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.

90.     The bin Mahfouz family businesses are organized through a series of "holding" companies, including a conglomerate, Saudi Economic and Development Company LLC (Sedco), founded in 1976 and based in Jeddah, and the petroleum company, Nimir Petroleum, which is chaired by Khalid bin Mahfouz's son.

91.     Between 1986 and 1990, Khalid bin Salim bin Mahfouz was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI). After several fraudulent practices were discovered, Khalid bin Salim bin Mahfouz was indicted on July 1, 1992, on

charges of participation in a Scheme to Defraud in the First Degree in violation of New York

Penal Law § 190.65, in connection with certain of Defendant's acts and omissions relative to

BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations,

sham loans, and fraudulent conduct in failing to disclose the status of Defendant's interest in

BCCI.

92.     Under Khalid bin Salim bin Mahfouz, the BCCI was also implicated in supporting

international terrorism, as reported by the United States Senate.

> In the course of targeting BCCI for laundering drug money, the CIA
> learned of BCCI's involvement in manipulating certain financial markets,
> in arms trafficking, and in supporting international terrorism, including
> handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist
> organization.

93.     The 1992 Senate investigative Report detailed the initial involvement of the BCCI

in terrorism financial supporting terrorism:

> BCCI's support of terrorism and arms trafficking developed out of several
> factors. First, as a principal financial institution for a number of Gulf
> sheikhdoms, with branches all over the world, it was a logical choice for
> terrorist organizations, who received payment at BCCI-London and other
> branches directly from Gulf-state patrons, and then transferred those funds
> wherever they wished without apparent scrutiny. Secondly, BCCI's
> flexibility regarding the falsification of documentation was helpful for
> such activities. Finally, to the extent that pragmatic considerations were
> not sufficient of themselves to recommend BCCI, the bank's pan third
> world and pro-Islam ideology would have recommended it to Arab
> terrorist groups.

94.     A bank audit of the National Commercial Bank conducted in 1998 revealed that

over a 10 year period $74 million dollars was funneled by its Zakat Committee to the

International Islamic Relief Organization, headed by Osama bin Laden's brother-in-law.

95.     The NCB audit report also stressed various irregularities due to "unreported

expenses and loans." It states that "without knowledge of the Zakat Committee, NCB Directors

established over the years credit and loans facilities for several charitable organizations, along

with banking facilities that were not reviewed by the Committee." Direct donations were

received through NCB facilities to the Red Crescent Saudi Committee, the International Islamic Relief Organization and the Muwaffaq Foundation. National Commercial Bank, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting al Qaeda, Osama bin Laden, and international terrorism.

96.    The NCB audit report points out a $3 million dollar transfer to Blessed Relief Foundation, an organization that provided material support of Osama bin Laden and founded by Khalid bin Salim bin Mahfouz. Khalid bin Salim bin Mahfouz was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under arrest in Taif. Former CIA Director James Woolsey testified before the Senate Judiciary Committee that along with the financial ties to and support of Osama bin Laden, Khalid bin Salim bin Mahfouz was Osama bin Laden's brother-in-law by virtue of bin Laden's marriage to bin Mahfouz's sister Kaleda. Khalid bin Mahfouz set up various charity organizations around the world since 1991. Every one of these foundations were linked to al Qaeda and involved in the financing and material sponsorship of Osama bin Laden's international terrorist operations.

## Dar al Maal al Islami

97.    Dar al Maal al Islami (or "House of Islamic Money" or "DMI") is the registered name for DMI Administrative Services SA. The company is headquartered in Cointrin, Switzerland. DMI Administrative Services SA replaced Dar al Maal al Islami on February 5, 2002, and is its successor in interest. DMI activities started July 29, 1981. Until 1983, DMI was operated under M. Ibrahim Kamel's chairmanship. On October 17, 1983, Prince Mohamed al Faisal al Saud became CEO. Under Mohammed al Faisal al Saud's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices around the world. DMI operates broadly in Islamic countries, and investments are conducted strictly under Islamic rules and with an understanding of the terrorist threat. His actions and breach of

duty have aided, abetted and provided material sponsorship of the spread of international terrorism and al Qaeda:

> The $3.5 billion DMI Trust, whose slogan is "Allah is the purveyor of success," was founded 20 years ago to foster the spread of Islamic banking across the Muslim world. Its 12-member board of directors includes Haydar Mohamed bin Laden, a half-brother of Osama bin Laden.

98.     DMI is currently chaired by Abdulkarim Khaled Uusuf Abdulla who replaced Prince Mohamed al-Faisal al-Saud in early 2002. DMI has involved itself in al Qaeda financing through several of its subsidiaries, including but not limited to, Islamic Investment Bank of the Gulf, Faisal Islamic Bank, Tadamon Islamic Bank, and Al Shamal Islamic Bank.

99.     DMI owns 100% of Islamic Investment Company of the Gulf. Mohamed al-Faisal al-Saud chairs Islamic Investment Company of the Gulf. Osama bin Laden's brother, Haydar Mohamed bin Laden, was a director of the company. Islamic Investment Company of the Gulf (Bahrain) EC is the main shareholder of Faisal Islamic Bank of Sudan, chaired by Mohamed al-Faisal al-Saud.

## Faisal Islamic Bank – Sudan

100.    Faisal Islamic Bank – Sudan, subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC and DMI, was one of the five main founders of Al Shamal Islamic Bank in April 1984 and became member of the board in July 1988. Mohammed al Faisal al Saud is heavily involved in the sponsorship of terror through Faisal Islamic Bank   Sudan.

101.    Defendant Faisal Islamic Bank – Sudan was implicated as an al Qaeda sponsor during the 2001 United States trial on the 1998 embassy bombings in Africa as managing bank accounts for al Qaeda operatives. A former finance manager for al Qaeda in Khartoum, Jamal Ahmed al-Fadl, testified:

> Q. Where were the accounts [of al Qaeda] held? In what countries?
> A. . . . we got account in Bank Faisl Islami [Faisal Islamic Bank].
> Q. Is that also in Khartoum?
> A. Yes."

102.    Defendant Faisal Islamic Bank's subsidiary in Turkey is currently under investigation by the Istanbul Prosecutor's Office on charges of tax irregularities concerning seven executives.   Prosecutors are demanding three years imprisonment for the executives including Defendant Mohammed al-Faisal al-Saud.

## Al Barakaat Exchange LLC

103.    Al Barakaat Exchange LLC (or "al Barakaat") is an international banking enterprise based in Dubai, United Arab Emirates, with several branches located around the world.  The United States government designated al Barakaat and its branches as terrorist entities on November 7, 2001, and froze the organization's assets.  Two of the United States branches—in Boston, MA, and Alexandria, VA—were accused of racketeering and conspiracy to avoid reporting financial transactions, respectively.  The members of the Alexandria branch have pled guilty.

104.    Under Secretary for International Affairs John B. Taylor has described al Barakaat as a premier financial transfer system for al Qaeda:

> Al Barakaat is a financial conglomerate headquartered in Dubai that operates in 40 countries including the United States. The founder of the organization, Shaykh Ahmed Nur Jimale, has close links with Usama bin Laden and has used al Barakaat to facilitate the financing and operations of Al Qaida and other terrorist organizations.

105.    Treasury Secretary O'Neill corroborated al Barkaat's funding of al Qaeda:

> The al Barakaat companies are the money movers, the quartermasters of terror. At core, it is a hawala conglomerate operating in 40 countries around the world with business ventures in telecommunications, construction, and currency exchange. They are a principal source of funding, intelligence and money transfers for bin Laden.

106.    Al Barakaat has or had branches in Minnesota, Massachusetts, Ohio and Washington State.  All of the al Barakaat Group of companies are co-conspirators, aiders and abettors, material sponsors of al Qaeda, Osama bin Laden and international terrorism.

## Tadamon Islamic Bank

107.    Defendant Tadamon Islamic Bank was formed in Khartoum, Sudan on November 28, 1981 and started operations on March 24, 1983, less than one month before Al Shamal Islamic Bank obtained banking authorization for its own activities.  The Tadamon Islamic Bank is active across Sudanese territory, through twenty-one different establishments and has several subsidiaries in Sudan.

108.    Shareholders of the Tadamon Islamic Bank include Al Baraka Investment and Development Corporation (and/or subsidiaries of the Saudi Dallah al Baraka Group) Saleh Abdullah Kamel, National Company for Development and Trade, and Dubai Islamic Bank. Defendant Faisal Islamic Bank Sudan, a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) EC, whose parent is Dar Al Mal Al Islami, was the main shareholder of Tadamon Islamic Bank as of 1995.

109.    Tadamon Islamic Bank facilitated, materially sponsored, aided and abetted, and/or conspired with al Qaeda and its international terrorists and financial operations.  According to a testimony of former al Qaeda financier in Khartoum, Jamal Ahmed Mohamed al-Fadl, during the 2001 trial regarding the 1998 Embassy bombings in Africa, Tadamon Islamic Bank managed accounts of al Qaeda operatives:

> Q.  "Do you recall anyone else that had bank accounts in their name for al Qaeda?
> A.  Abdouh al Mukhlafi.
> Q.  Who was this person named Abdouh al Mukhlafi?
> A.  He is from Yemen.
> Q.  What role did he play for Bin Laden?
> A.  He goes with Bin Laden when Bin Laden travel outside or inside Sudan.
> Q.  What role did he play for Bin Laden when Bin Laden traveled?
> A.  He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.
> Q.  Did he handle money during the travel?
> A.  Yes.
> Q.  Where were the accounts held?  In what countries?
> A.  In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."

110.    Tadamon Islamic Bank is also a shareholder of Defendant Al Shamal Islamic Bank, a bank formed in Sudan and extensively used for al Qaeda operations. Tadamon Islamic Bank joined the provisional Board of Directors of Al Shamal Bank on July 1988 and has been a major shareholder of Al Shamal Islamic Bank since March 26, 1986.

## Dubai Islamic Bank

111.    Dubai Islamic Bank is headquartered in the United Arab Emirates (or "UAE") and was created in 1975. The Dubai Islamic Bank is chaired by Mohamed Khalfan bin Kharbash, the current UAE Minister of Finance. The Dubai Islamic Bank is a shareholder of Baraka Islamic Bank EC, an affiliate of Defendant Al Baraka Bank. Dubai Islamic Bank is also a shareholder of Defendant Tadamon Islamic Bank in Sudan, which is a shareholder of the Defendant Al Shamal Islamic Bank.

112.    Dubai Islamic Bank has a history of illicit money laundering. Dubai Islamic Bank was one of the BCCI's main shareholders, investing $80 million. Dubai Islamic Bank was also involved in a number of other illicit financial scandals, including the $242 million money-laundering operation through gold trading involving Foutanga (Babani) Sissoko, a billionaire from Mali.

113.    In 1999, the United States announced that Dubai Islamic Bank had laundered money for Osama bin Laden. On July 8, 1999, a spokesman for the United States State Department stated that the government of the United Arab Emirates reported that they have taken steps to clean up the Dubai Islamic Bank and to restore its reputation. Asked whether his comment implied that wrongdoing had been occurring at the Dubai Islamic Bank, the State Department spokesman admitted this fact. The Dubai Islamic Bank has engaged in a pattern of conduct that demonstrates aiding, abetting and material sponsorship of international terrorism.

114.   The United States State Department also confirmed that a United States delegation traveled to the United Arab Emirates with evidence that Osama bin Laden was channeling funds through the Dubai Islamic Bank.   The Central Intelligence Agency had obtained evidence that Osama bin Laden has been allowed to funnel money through the Dubai Islamic Bank.

115.   Dubai Islamic Bank is involved in providing financial facilities and support to the terrorists for various anti-American terrorist operations, including the September 11, 2001 attacks.   The Dubai Islamic Bank's involvement, support and role in the September 11, 2001 attacks was noted in a draft general report on the economic consequences of September 11, 2001, and the economic dimensions of anti-terrorism, by NATO on April 22, 2002:

> It is now apparent that institutions located in United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the 11 September attacks. There has subsequently been much discussion about a traditional trust based means of transferring value; the al Hawala transaction system, which allows clients to move funds internationally without leaving any traces of the operation. The Al Barakaat Hawala operating out of Somalia and the UAE apparently helped to move funds to the terrorists who carried out the New York and Washington Attacks. al Qaeda had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania.

116.   Mustafa Ahmed al-Hisawi (a/k/a Sheikh Saeed), a Saudi national, was Osama bin Laden's chief financial officer during his time in Sudan from 1991 to 1996, before bin Laden went to Afghanistan.   In June of 2001, Mustafa al-Hisawi arrived in the United Arab Emirates from Qatar. He left the UAE for Karachi, Pakistan, on September 11, 2001.

117.   United States' authorities have identified at least $500,000 that flowed from overseas sources into United States accounts controlled by some of the hijackers, including transfers from Mustafa Ahmed al-Hisawi to Germany, the United States, and to the banks in the State of Florida in particular.

118.    Mustafa Ahmed al-Hisawi held accounts at the Dubai Islamic Bank (and its affiliate and correspondent, Standard Chartered Bank) where money transfers originated to hijackers Marwan al-Shehhi and Mohammed Atta since at least June 2000.

119.    For example, on June 29, 2000, $4,790 was wired from the United Arab Emirates to Marwan al-Shehhi. With it, Marwan al-Shehhi opened up a joint account in his and Mohammed Atta's name at the Florida SunTrust bank. Atta and al-Shehhi also had set up accounts in Dubai, Atta and al-Shehhi, al-Shehhi at a branch office of the Hong Kong Shanghai Bank (HSBC Holdings); Atta at the branch office of Citibank. Money was deposited into these accounts by cash, check or wire from various sources and then transferred to their Florida account by wire.

120.    In July 2001, $109,440 arrived in al-Shehhi and Atta's joint Florida bank account. $9,985 was sent on July 19th. $9,485 came on August 7, 2000. $19,985 came on August 30, 2000. $69,985 came on September 18, 2000. During this period, Atta and al-Shehhi used the money to pay for their training at two airports on small aircraft, and other expenses related to the September 11, 2001 attacks.

121.    Two days before the terrorist attacks on September 11, 2001, Mustafa Ahmed al-Hisawi received transfers back of "surplus" funds of $ 15,000 from three of the hijackers, Mohammed Atta, Walid al-Shehri and Marwan al-Shehhi.

122.    On September 27, 2001, on United States demand, the Central Bank of the United Arab Emirates announced that it had ordered the freezing of accounts and investments of twenty-six persons or organizations suspected of having contacts with the al Qaeda organization and Osama bin Laden, including the Dubai Islamic Bank.

123.    Additionally, on Sept 25, 2001, Luxembourg's commission for supervising financial institutions (Commission de Surveillance du Secteur Financier), issued a regulatory alert naming Dubai Islamic Bank as having links with Osama bin Laden and terrorism.

## Bank al-Taqwa Limited

124.    Bank al-Taqwa Limited (or "Bank al-Taqwa") was established in the spring of 1988 in Nassau, Bahamas.  Shrouded in secrecy, the actual number and locations of its satellite offices is unclear.  Bank al-Taqwa has a registered office in Nassau, Bahamas and Lugano, Switzerland, but is reported to have a presence in more than thirty countries.  Apparently, Bank al-Taqwa does not maintain offices in the Middle East and does its international banking business through other banking institutions to maintain a presence in the Middle East.

125.    Prominent members of the Muslim Brotherhood created Bank al-Taqwa.  The bank's President, Youssef Nada, has been a member of the Egyptian Muslim Brotherhood for fifty years.  Vice President, Ali Ghalib Himmat, is a long standing member of the Syrian Muslim Brotherhood as well.

126.    As an Islamic bank, Bank al-Taqwa is overseen by a Shari'ah board, or religious council.  The members of this board include Youssef al-Qardawi, a leading member of the Muslim Brotherhood and Abdel Fattah Abu Ghadda, of the Syrian Muslim Brotherhood.

127.    Albert Friedrich Armand Huber (or "Ahmed Huber"), a director of the bank, stated in a 1995 interview that Saudis with money from oil are very active investors in Bank al-Taqwa.  An inspection of a list of the shareholders of the Bahamas branch verifies this statement.  There are hundreds of shareholders of Bank al-Taqwa, most of whom are from the Gulf State region.  Youssef Nada has stated that at the peak of its fourteen year life Bank al-Taqwa controlled $220 million dollars.

128.    On November 7, 2001, Bank al-Taqwa, its affiliated businesses, and its key executives were designated as financial supporters of al Qaeda by President George W. Bush.  Along with the designation was a call for the freezing of Bank al-Taqwa's assets.  The company's headquarters, two of its satellite offices and a few of the executives' residences were

raided as part of the international investigation into the bank's relationship with and sponsorship

of Osama bin Laden, al Qaeda, and international terrorism.

129.    When President George W. Bush announced the designation of Bank al-Taqwa as

part of the al Qaeda financial network, he described Bank al-Taqwa as follows:

> Al Taqwa is an association of offshore banks and financial management
> firms that have helped al Qaeda shift money around the world.    Al
> Taqwa... raise[s] funds for al Qaeda.   They manage, invest and distribute
> those funds.  They provide terrorist supporters with Internet service, secure
> telephone communications and other ways of sending messages and
> sharing information.  They even arrange for the shipment of weapons.

130.    President George W. Bush also explained how Bank al-Taqwa works as a front-

organization that covertly aids and abets al Qaeda:

> They present themselves as legitimate businesses, but they skim money
> from every transaction for the benefit of terrorist organizations.    They
> enable the proceeds of crime in one country to be transferred to pay for
> terrorist acts in another.

131.    Bank al-Taqwa was designated as a terrorist entity because it serves, supports and

fosters al Qaeda.  By curtailing Bank al-Taqwa's operations, President George W. Bush believes

that al Qaeda's operations will be curbed as well:

> By shutting these networks [al Taqwa] down, we disrupt the murderer's
> work.  Today's action interrupts al Qaeda's communications.  It blocks an
> important source of funds.
> …
> Today, we've taken another important action to expose the enemy to the
> light and to disrupt its ability to threaten America and innocent life.

132.    Ahmed Idris Nasreddin (or "Nasreddin"), an officer at Bank al-Taqwa, was

designated as a terrorist on April 19, 2002, for his role in financially supporting al Qaeda.

133.    On August 29, 2002, fourteen additional organizations affiliated with Bank al-

Taqwa were designated by President George W. Bush and had their assets frozen for financially

aiding and supporting al Qaeda.  These organizations were either owned or run by one of the

Bank al-Taqwa executives, Youssef M. Nada or Ahmed Idris Nasreddin, who were already

designated:   Akida Bank Private Limited; Akida Investment Co. Ltd.; Nasreddin Group International Holding Limited; Nasco Nasreddin Holding A.S.; Nascotex S.A.; Nasredding Foundation; Ba Taqwa for Commerce and Real Estate Company Limited; Miga-Malaysian Swiss, Gulf and African Chamber; Gulf Center S.R.L.; Nascoservice S.R.L.; NASCO Business Residence Center SAS Di Nasreddin Ahmed Idris EC; Nasreddin Company Nasco SAS Di Ahmed Idris Nasreddin EC; Nada International Anstalt; and Nasreddin International Group Limited Holding.

134.   In the early 1990s, Ahmed Nasreddin, one of the designated Bank al-Taqwa executives, aided the establishment of a mosque highly utilized by the al Qaeda terror network. The mosque, the Islamic Cultural Institute of Milan, Italy, is just across the border from Lugano, Switzerland.  It has acted as a recruiting and coordination center for al Qaeda cells in Europe. The United States Treasury Department issued a press release that describes the Islamic Cultural Institute of Milan as "the main al Qaeda station house in Europe.  It is used to facilitate the movement of weapons, men and money across the world."

135.   Nasreddin's lawyer, P. F. Barchi, admitted that in the mid-1990s Egyptian Secret Service agents warned Nasreddin about potential terrorist problems with the mosque.  Barchi also confirms that Nasreddin financially supported the center through charitable donations that were used for rent, utilities and expenses.

136.   Youssef M. Nada, one of the terrorist designated Bank al-Taqwa executives, employed the al Qaeda financier and Defendant, Sulaiman Abdul Aziz al-Rajhi.  Sulaiman Abdul Aziz al-Rajhi worked for Youssef M. Nada at the Akida Bank in the Bahamas, which has also been designated for providing financial support to al Qaeda.  Outside of his role with Akida Bank, Sulaiman al-Rajhi has provided material support and sponsorship to al Qaeda and international terrorism through the al-Rajhi Banking & Investment Corporation and the SAAR Foundation "charities."

137.  Al Taqwa Trade, Property and Industry Company Limited, Akida Bank Private Limited, Akida Investment Co. Ltd., Asat Trust Reg., Ba Taqwa for Commerce and Real Estate Company Limited, Bank Al-Taqwa Limited, Gulf Center S.R.L., Miga-Malaysian Swiss, Guld and African Chamber, Nada International Anstalt, Nada Management Organization SA, Nasco Business Residence Center Sas di Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R.L., Nascotex S.A., Nasreddin Company Nasco Sas di Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, and Youssef M. Nada & Co. are aiders, abettors, material sponsors and/or co-conspirators of Bank al-Taqwa Limited and are designated as sponsors of al Qaeda and international terrorism by the United States government.

## Arab Bank, PLC

138.  Arab Bank, PLC operates an international banking system that is used regularly by al Qaeda's Spanish cell for transfers of cash to members of al Qaeda operating in Germany, Pakistan, Afghanistan, Lebanon, Yemen, Bosnia, and elsewhere.  Several of the recipients of cash transfers through Arab Bank PLC have been incarcerated or are being sought as key members of the al Qaeda organization with direct tires to the hijackers and terrorists who perpetrated the September 11, 2001 attacks.  Arab Bank PLC has materially supported, aided, abetted and financed al Qaeda.

139.  In mid-1996, Osama Darra and Mohamed Needl Acaid [presently incarcerated in Spain] managed a commercial establishment named Decomisos Mardini in Madrid.  They made fraudulent use of credit cards, defrauding amounts totaling 1,947,8974 Spanish Pesetas and 7,419,490 Spanish Pesetas, with the aim of applying the amounts obtain to financing and supporting al Qaeda.  Throughout the latter half of 1996, Mohamed Needl Acaid remited through Arab Bank, PLC numerous cash transfers to Islamic extremists associated with Chej Salah (chief

recruiter for terrorists recruited from Spain in Peshawai, Pakistan).   Arab Bank has branch offices in United States, including in New York, New York, and across the world.

## Saudi American Bank

140.    Saudi American Bank is based in Riyadh, Saudi Arabia, and was formed in 1980 pursuant to a royal decree to take over the then existing branches of Citibank in Riyadh and Jeddah, Saudi Arabia.  Citibank had opened its Jeddah branch in 1955 and its Riyadh branch in 1966. Saudi American Bank was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970's under which all foreign banks were required to sell majority equity interests to Saudi nationals.

141.    Saudi American Bank started operations on July 12, 1980, based in Riyadh.  The Saudi American Bank is chaired by Abdulaziz Bin Hamad Al Gosaibi. Khalil A. Kordi and Rashid M. Al. Romaizan are among the directors of the bank.  The Saudi American Bank is the second largest bank in Saudi Arabia.

142.    The Saudi American Bank has offices in the United States based in New York. The Chairman of the bank is Abdulaziz Bin Hamad Al Gosaibi who was born in 1923 is also Chairman of the Saudi Cement Company in Damman, Saudi Arabia.   The Saudi Cement Company shareholders include Defendant Omar Sulaiman Al-Rajhi.  The Saudi American Bank is also the main banker of Arab Cement Company. The company is owned by Al Rajhi Group and Saudi Binladin Group.   Arab Cement Company is managed by several other Defendants including Khalid bin Salim bin Mahfouz and Mohammed Bin Laden.

143.    The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Defendant Saleh Abdullah Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

144.    The Saudi American Bank serves as the bank for the Dallah al Baraka Group, named as Defendant herein and chaired by Defendant Saleh Abdullah Kamel.   The Saudi

American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Binladin for Contracting and Trading is owned by members of the Bin Ladin family including Bakr Bin Laden and Mohammed Bin Laden.

145. Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaeda terrorists, the Saudi Binladin Group offered material support. The Public Buildings and Airports Division of Saudi Binladin Group participated in the construction of the Port Sudan Airport, and Mohamed BinLadin Organization (or "Binladin Organization") provided a technical assistance to major road construction. The Saudi Binladin Group confirmed publicly these two collaborations with Sudan during al Qaeda's and Osama bin Laden's tenure there.

146. Saudi American Bank financed these Sudanese works directly providing material support and assistance to Osama bin Ladin. Indeed, Saudi American Bank was the main banker of the Saudi Binladin Group and Binladin Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank, which is managed by Defendant Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaeda terrorist operations as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of Al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaeda.

147. In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants World Assembly of Muslim Youth, International Islamic Relief Organization and al Haramain Foundation.

148. Defendnat al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali

Jumale, is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there.

149.    Ali Ghaleb Himmat, Ahmed Huber, Mohamed Mansour, Zeinab Mansour-Fattouh, Ahmed Ali Jumale, Ahmad I. Nasreddin and Youssef M. Nada (a/k/a Youssef Mustafa Nada) are aiders, abettors, material sponsors and/or co-conspirators of international terrorism.

<u>THE CHARITY DEFENDANTS</u>

## The Charity Fronts of Terror

150.    Shortly after September 11, the United States Treasury Department designated a number of charities as terrorist entities and froze their assets.  These included the Rabita Trust, al-Haramain, al-Rashid Trust, Wafa Humanitarian Organization, and others.  Furthermore, the Treasury Department froze the assets of the Benevolence International Foundation and the Global Relief Foundation.  Many of these charities are Saudi funded.  Then, in a series of raids over two days in March 2002, federal and local officials stormed the offices of several locations in Virginia and Georgia.  These locations housed numerous charities that funnel money to and from al Qaeda.  Certain of these entities are under criminal investigation or indictment.

151.    Islamic extremists have usurped charities as a means to raise funds and travel the world easily and efficiently.  Numerous charities around the world have been pinpointed as used for terrorist purposes.  Some have been shut down, while others have continued to thrive, raising new funding for international terrorist activities.

152.    As an organization, al Qaeda began with Mekhtab al Khidemat (Arabic for the "Office of Services"), which was a purported charitable organization with offices all over the

world. In the United States indictment of al Qaeda and Osama bin Laden for the 1998 United States Embassy bombings in East Africa, the government noted that:

> [Al Qaeda] grew out of the "mekhtab al khidemat" organization which had maintained offices in various parts of the world, including Afghanistan, Pakistan (particularly in Peshawar) and the United States, particularly at the Alkifah Refugee Center in Brooklyn, New York.

153.    The charity Defendants in this action are used as terrorist fronts, to mask money transfers and provide cover for terrorist operatives.

## Al-Haramain Islamic Foundation, Inc.

154.    The Saudi Arabian-based al-Haramain Islamic Foundation Inc. (or "al-Haramain") is a private charitable organization that is supposed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, al-Haramain quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. Al-Haramain raises most of its funds from Saudi Arabia where it oversees the distribution of its resources across the world.

155.    Although al-Haramain incorporates in many of the countries in which it operates these branches are still controlled primarily from al-Haramain's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, Aqeel al-Aqeel and Mansour al-Kadi, both reside in Riyadh, Saudi Arabia where they run all of al-Haramain worldwide. Defendant al-Haramain Islamic Foundation, Inc., is a Saudi charity front that has exploited its non-profit status for the benefit of Osama bin Laden and his terrorist network al Qaeda, in the furtherance of international terrorism. In doing so, al-Haramain has developed an extensive worldwide network. Many of al-Haramain's foreign branches have been exposed for providing direct and material support to al Qaeda. The United States State Department has designated two of al-Haramain's branches located in Bosnia and Somalia, as terrorist entities and frozen the assets of both. The leaders of al-Haramain have direct links to al Qaeda.

156.   In December of 1999, al-Haramain conducted a joint fundraising event with a known al Qaeda front, the Defendant International Islamic Relief Organization (IIRO) and suspected front, the World Assembly of Muslim Youth (WAMY) in Riyadh, Saudi Arabia. Al-Haramain and its co-conspirators also solicit and operate widely in the United States.

157.   Co-conspirators, aiders and abettors of the al-Haramain Islamic Foundation doing business or registered to do business in the United States include Defendants: Al Haramain Foundation; Al Haramain Islamic Foundation, Inc.; Aqeel Abdul-Azeel al-Aqeel; Mansour al-Kadi, Soliman H.S. al-Buthe; and Perouz Seda Ghaty.

## Al-Haramain's Humanitarian Efforts Used to Conceal Support for al Qaeda

158.   Al-Haramain's self-titled "Most Important Aims" include relief work in areas of the world where Muslims are deprived. An unwritten, though no less important, aim of al-Haramain is providing assistance to Osama bin Laden's al Qaeda.

159.   Intelligence officials throughout the world have acknowledged that al-Haramain exploited its non-profit status in secreting its aid to terrorist groups. In referring to al-Haramain in a speech given on March 11, 2002, United States Treasury Secretary Paul O'Neill, stated:

> Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.

160.   After the June 2, 2002, raids of al-Haramain offices in Bosnia, the Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> We detected a pattern here . . . for terrorist cells and those who aid and harbor them to operate behind the shield of legitimate humanitarian . . . organizations.... They were preaching good, and sometimes doing good, while plotting evil.

161.    On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the al-Haramain Islamic Foundation. These branches of al-Haramain were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated:

> The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing.

162.    Although al-Haramain in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the al-Haramain headquarters in Riyadh, Saudi Arabia.

163.    Al-Haramain's Bosnia and Somalian offices and the rest of al-Haramain are closely intertwined.   Al-Haramain's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches.  The headquarters also maintains one website that covers al-Haramain worldwide and, on occasion, devotes certain pages of its website to certain individual branches.

164.    A United States Treasury Department Press Release stated that al-Haramain worked with the al Qaeda linked Somali-based terrorist group al Itihaad al-Islamiya and the al Qaeda financial vehicle al-Barakaat Bank. The press release states:

> The Somalia office of al-Haramain is linked to Osama bin Laden's al Qaeda network and al-Itihaad al-Islamiya (AIAI), a Somali terrorist group. al-Haramain Somalia employed AIAI members and provided them with salaries through al-Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for Osama bin Laden.

165.    The cooperation between al Qaeda and al-Itihaad al-Islamiya has not ceased.  The 2002 United States Department of State's Patterns on Global Terrorism report states that al-Itihaad al-Islamiya is a terrorist group that maintains ties to al Qaeda. The Treasury Department Press Release about the designation also states that al-Haramain's support of al-Itihaad al-Islamiya has been concealed under its humanitarian cover:

> Over the past few years, al-Haramain Somalia has funneled money to
> AIAI by disguising funds as if they were intended for orphanage projects
> or Islamic school and mosque construction. The organization has also
> employed AIAI members and provided them with salaries through
> Barakaat Banks and Remittances, a subsidiary of al-Barakaat Bank.

166.    This concert of action, aiding and abetting of terror and material sponsorship of

international terrorism is precisely the hallmark of the offensive upon the United States that

culminated on September 11, 2001.

## Al-Haramain's Ties to al Qaeda's 1998 United States Embassy Bombings

167.    The al-Haramain Islamic Foundation was banned from Kenya for national

security concerns following the 1998 embassy bombings. Osama bin Laden and al Qaeda were

convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi,

Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and

injured more than 4,000. These indictments and convictions demonstrate the United States

government's belief that both Osama bin Laden and al Qaeda have commited acts within and

outside the United States which trigger the United States District Courts' jurisdiction over such

entities.

168.    The United States Treasury Department Press Release following the March 11,

2002, designation of al-Haramain's Bosnian and Somalian offices, stated the following about its

connection to the terrorist group al-Gama'a al-Islamiyya:

> The Bosnia office of al-Haramain is linked to al-Gama'a al-Islamiyya, an
> Egyptian terrorist group. Al-Gama'a al-Islamiyya was designated on
> November 2, 2001 and it is a signatory to Osama bin Laden's Fatwah
> dated February 23, 1998, targeting Americans and their allies.

169.    In March 2002, Bosnian officials raided al-Haramain's Sarajevo office and

discovered more proof of al-Haramain using its humanitarian image as a cover for terrorism. A

Bosnian intelligence report explains how investigators discovered that al-Haramain's financial

records from 1994 through 1998 had been destroyed and that $1.59 Million dollars had been

inexplicably withdrawn from the charity between 1999 and 2001. The Bosnian intelligence report about the March 2002 raids also stated: "We believe that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism." In 2001, the Saudi-based al-Haramain aided al Qaeda terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

170.    Al-Haramain's website used to have a direct link to the al Qaeda site about the Chechnyian operations (qoqaz.com).    The website is part of the al Qaeda propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others). The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut-down the sites for their role as an al Qaeda sponsor, promoter and mouthpiece.    FBI Special Agent Robert Walker described qoqaz.net, the English-language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of Complaint Against Benevolence International Foundation, Inc. and Enaam M. Arnout. In his Affidavit, Walker stated that qoqaz.net leverages its relationship with charities:

> In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen.  CW-1 has identified Ibn al Khattab as a well known mujahideen leader with links to Osama bin Laden. . . .

> The website condemned America . . .

171.    Shortly after the merger of Egyptian Islamic Jihad with Osama bin Laden's al Qaeda (See Sudan allegations, infra), Ahmed Ibrahim al-Najjar, initially a member of the Egyptian Islamic Jihad, was sent on a new mission to Albania to work for al-Haramain.  After al-Najjar was deported from Albania to Egypt in 1999, he was sentenced to death for acts of terrorism.  In his testimony, al-Najjar admitted to being a full-fledged al Qaeda member who entered Albania with a false passport and who, like many other al Qaeda operatives, was engaged in purported humanitarian activities while waiting for new orders to act. The case of al-

Najjar is but one example of a senior al Qaeda operative who not only found refuge from authorities with al-Haramain, but a platform from which to wage war and promote the use of terror.

172.    Al-Haramain took part in a committee of charitable organizations that formed the Saudi Joint Relief Committee (or "SJRC").  Along with al-Haramain, the SJRC is comprised of the IIRO, WAMY, the Saudi Red Crescent, and the Muslim World League, among others.  The SJRC has been connected to Osama bin Laden and two of his top operatives, Wa'el Hamza Jalaidan and Adel Muhammad Sadiq bin Kazem.  The United States Treasury Department has branded Jalaidan a Specially Designated Global Terrorist Entity [SDGT], stating that Jalaidan is "an associate of Usama bin Laden and a support of al-Qa'ida terror."  Al-Haramain has been able to continue its cooperation with al Qaeda for years in large part due to its ostensible appearance as a humanitarian organization.

173.    In the United States, al-Haramain has three business entities in Ashland, Oregon: al-Haramain Foundation, al-Haramain Islamic Foundation, and al-Haramain Islamic Foundation, Inc. All three of these separately filed businesses are at the same address and under the same management.  These three businesses are one and the same as al-Haramain's headquarters in Riyadh, Saudi Arabia.  The President and Vice-President of the United States branch, Aqeel al-Aqeel and Mansour al-Kadi, are the Secretary General and Deputy General, respectively, of the Riyadh office.  The al-Haramain branch in Ashland, Oregon, is specifically linked to al Qaeda operations.

174.    Al-Haramain Ashland states in its year 2000 Form 990 that it operates an Islamic center in Springfield, Missouri.  Corporate records reveal that al-Haramain owns property in Springfield, Missouri.

175.   Al-Haramain has been implicated as providing funds for the bombing of a night club in Bali in 2002. Al-Haramain continues in its illicit pattern of conduct in sponsoring acts of international terrorism.

## Al Haramain role in funding international terrorism is ongoing and demonstrates a pattern of conduct

176.   During an interrogation conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002, Umar Faruq, senior al Qaeda representative in Southern Asia, confessed that al-Haramain was the main financial mechanism for funding terrorists operations in the region, through its Indonesian office director in Jakarta, Ahmed al-Moudi. The al-Haramain organization is said to have planned terrorist attacks in Indonesia.

> Al Haramayn was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East. Money was given to [*him*] to al Harmayn's branch in Jakarta, which he said is connected to Kompak [*Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakwah Islamiyah organization, Islamic Propagation Council in Indonesia*]. The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [*Director of Kompak*]. Faruq was given orders by Rashid [*al-Qaida senior officer*] to get money transferred to the foundation's office in Jakarta through Ahmed al-Moudi [*head of al Haramayn's office in Jakarta*].

177.   Umar Faruq further stated that al-Haramain received money from a Saudi Sheikh (Sheikh Bandar), who heads the al-Haramain Islamic Foundation in Saudi Arabia according to Faruq.

> [*Sheikh Bandar*] gave $99,000 to Faruq to give to Al Moudi. Faruq said Sheikh Bandar was the head of Al Haramayn in Saudi Arabia.

178.   Furthermore, during a custodial interview on September 9, 2002, Umar Faruq stated that terrorist operations of Jemaah Islamiya (founded by Abu Bakar Bashir), an Islamic extremist group closely associated with al Qaeda were funded by donations channeled through al Haramain Islamic Foundation:

Al Qaeda encourages Basyir's [*Abu Bakar Bashir*] goal to spark a religious civil war in Indonesia in order to achieve his vision of a pure Islamic state under Islamic law. Basyir's plan of training jihadists and massing weapons and ammunition has been coordinated with Rashid, a senior lieutenant of Usama bin Ladin. Rashid also acts as a representative of a committee of Gulf-state sheiks who are Al Qa'ida financiers and who have committed ample funds, weapons, ammunition and computers to support this war. Funds are channeled through the Al-Haramayn NGO.

179.    Al-Haramain is engaged in unlawful aiding, abetting, conspiring with and offering material support to al Qaeda which constitutes an unlawful pattern of conduct, illicit scheme and enterprise.

## Benevolence International Foundation Inc.

180.    The Benevolence International Foundation (a/k/a Al Bir al DaWalia) (or "BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992. One of the directors listed on the incorporation documents is Defendant Adel Abdul Jalil Batterjee (a/k/a Adil Abdul Galil Batargy) (or "Baterjee"). BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingueshetia.

181.    The organization is also known as "al Bir al Dawalia," which translated from Arabic means "Benevolence International." It was originally founded in the 1980's by a wealthy Saudi Arabian national named Adel Abdul Jalil Batterjee, who was an associate of Osama bin Laden. Defendant Adel Abdul Jalil Batterjee later transferred control of the organization to the current Chief Executive Officer Enaam M. Arnaout (or "Arnaout"). Defendant Enaam Arnaout has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds to sponsor al Qaeda.

182.    Adel Abdul Jalil Batterjee is a wealthy Saudi Arabian businessman. He has investments across a number of different industries including commercial, property, medical,

industrial, and contracting. This business is done primarily through the family's business, the Batterjee Group, but also through other investments and businesses. Recent attempts to locate Batterjee in Saudi Arabia have failed and it is currently believed that he may be in the Sudan.

183.    Batterjee originally met Arnaout in 1987 when Arnaout was teenager studying Islam in Pakistan. Batterjee appointed Arnaout as the head of the Bosnian branch in the early 1990s. According to Benevolence International Foundation's 1992 articles of incorporation, Adel Batterjee is one of the three founders of BIF in the United States. In 1993, the Saudi Government closed Batterjee's charity al-Birr at the same time it was closing other organizations for ties to terrorism. Following this closing, Batterjee moved the BIF headquarters to Chicago, Illinois and brought Arnaout in from Bosnia to run the organization. Batterjee officially transferred control of the organization to Enaam Arnaout on September 15, 1997, when Arnaout assumed the Executive Director position.

184.    Adel Batterjee's name does not readily appear in any Benevolence International Foundation corporate records after 1994, yet he continued funding the foundation. On February 12, 2002, the United States Government recorded a telephone conversation that the now jailed CEO of BIF, Enaam Arnaout, had with his brother Hisham in Saudi Arabia. During this conversation, Arnaout discusses "Abu Sulafa" with his brother. The United States government has identified the name "Abu Sulafa" as an alias for Adel Batterjee. Using Batterjee's alias, Arnaout states the Batterjee has been sending money to Benevolence International Foundation's branches:

> EA:  And the man [Abu Sulafa], may God reward him with goodwill, he loves goodwill, so he does not want to boycott the offices, (UI) the offices, he is sending them wire transfers. So, if, if I receive a wire transfer from him, to any office of the offices, my home is destroyed.
> H:   Yes, meaning, should I tell him not to send a thing.
> EA:  Tell him, oh brother, now, they want, now scrutinizing on what is our relation to Saudi Arabia.
>      …

> EA:    So I want you to talk to Abu Sulafa, tell him "Enaam is telling you,
>         that oh beloved brothers, the scrutiny now is on a Saudi
>         connection."
> (EA:  Enaam Arnaout, H = Hisham, Arnaout's brother)

185.    One Justice Department al Qaeda expert suggested that this telephone conversation may further elucidate Batterjee's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

186.    Evidence introduced in the criminal trial of <u>United States v. Usama Bin Laden, et al.</u>, Case Number S98 Cr. 1023, United States District Court, Southern District of New York, and gathered in the related investigation, demonstrated that al Qaeda sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses. In addition, al Qaeda terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously. They are also taught to avoid putting matters in writing. Al Qaeda members have held positions with BIF and this charity is one of the organizations utilized by al Qaeda.

187.    Once money was withdrawn from the bank accounts of relief organizations, its use by al Qaeda can be virtually untraceable. According to an affidavit of Special Agent Robert Walker of the FBI, an al Qaeda witness explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor. According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were provided to al Qaeda for whatever use al Qaeda deemed necessary. This is consistent with evidence adduced at the 1995 trial in the Southern

District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence. Al Qaeda operatives and supporters have also smuggled money into the United States.

188.   On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered included documents establishing direct communication between Enaam Arnaout and Osama bin Laden and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

189.   On December 16, 1994, Defendant Mohamad Jamal Khalifa, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Mohamad Jamal Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation (or "BIC") and the International Islamic Relief Organization (or "IIRO"). At the time of his travel, Mohamad Jamal Khalifa had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with Mohamad Jamal Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Mohamad Jamal Khalifa was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Mohamad Jamal Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money.

190.   Mohamad Jamal Khalifa, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19,

1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa.

191.    Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

192.    A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements:

> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands.
>
> Steeds of war projects.

193.    The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

194.    On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country.

195.    BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

196.    Enaam Arnaout has a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents. BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in

terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda have had contacts with Benevolence International Foundation offices and personnel.

197.    Benevolence International Foundation has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan.  Benevolence International Foundation made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

198.    On December 14, 2001, searches were conducted of the offices of Benevolence International Foundation in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, Enaam M. Arnaout, removing materials from each place. According to a government witness, Enaam M. Arnaout was planning in March 2002, to leave for Jeddah, Saudi Arabia.

199.    Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking Benevolence International Foundation's assets and records, pending further investigation into BIF's ties to terrorists.  Enaam M. Arnaout, Chairman of Benevolence International Foundation, has a relationship with Osama bin Laden and key associates dating back more than a decade.  The Benevolence International Foundation is used by al Qaeda for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaeda have contacts with the Benevolence International Foundation and its office personnel; and, Benevolence International Foundation has had direct dealings with al Qaeda operatives, providing them with military and financial support.  Defendant Arnaout has been criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of al Qaeda.

200.   In the latter part of the 1980's, an al Qaeda organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States.   The organization was operated principally by Sheik Abdullah Azzam and Osama Bin Laden for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan.

201.   In the mid to late 1980s, Defendant Enaam Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

202.   Within that same time frame, Defendant Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden.   Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

203.   Defendant Arnaout and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

204.   Defendant BIF and Arnaout and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

205.   Defendant Arnaout and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, material facts about Defendant

Arnaout's relationship with organizations engaging in violence, including al Qaeda and Osama Bin Laden.

206.    Defendant BIF and Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities.  Defendant BIF and Arnaout and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

207.    Defendant BIF and Arnaout and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

208.    Defendant BIF and Arnaout and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

209. BIF and Arnaout engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

210. In or about 1992, Defendant Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami.

211. Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including al Qaeda members and soliciting donations to support international terrorism.

212. On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

213. In or about November 1995, Defendant Arnaout and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen. Defendant Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

214. In or about May 1998, BIF and Arnaout facilitated the travel of an influential founding member of the al Qaeda network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

215. In the latter part of the 1990's, with Defendant Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaeda's majlis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

216. Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's

checking account in the United States.  Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

217.    In or about October 2001, Defendant Arnaout relayed to the BIF founder Adel Batterjee in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government and in particular the fact that Defendant Arnaout had been searched at the airport upon his return to the United States.

218.    In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant Arnaout spoke via telephone to Adel Batterjee in Saudi Arabia, and Batterjee requested Defendant Arnaout to relocate with his family to Saudi Arabia.

219.    Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaeda, including:

        i.    a chart of an organization involved in military activity headed by Osama Bin Laden;

        ii.   notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

       iii.  notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

       iv.  personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v.   a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

vi.   various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii.   various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii.   various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix.   a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons; and

x.   In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant Arnaout falsely and publicly stated that he did not know Osama Bin Laden personally, that Defendant Arnaout never fought against the Soviet Union, that Defendant Arnaout was never at the al Masada camp.

220.   On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

221.   On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

222.   Enaam M. Arnaout conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism in violation of Title 18, United States Code, Sections 2339A and 2 and other criminal statutes.

223.   Defendant Arnaout and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

224.   Enaam M. Arnaout conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the mail fraud and wire fraud; in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

225.   Enaam M. Arnaout for the purpose of executing a scheme to defraud knowingly caused an envelope containing a donation check in the amount of $1,620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

> Benevolence International Foundation
> 9838 S. Roberts Rd. #1W
> Palos Hills, IL 60465

226.   Enaam M. Arnaout for the purpose of executing a scheme to defraud, knowingly caused an envelope, containing a donation check in the amount of $1,000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

Benevolence International Foundation
9838 S. Roberts Rd. #1W
Palos Hills, IL 60465

227.    Enaam M. Arnaout for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey; in violation of Title 18, United States Code, Sections 1343 and 2.

228.    Co-conspirators, aiders and abettors of the Benevolence International Foundation (a/k/a al-Birr al-Dawalia), include Defendants:  Benevolence International Foundation – U.S.A. (Main Office), Benevolence International Foundation – U.S.A. (East Coast Office), Benevolence International Foundation – Canada, Syed Suleman Ahmer, Enaam Mahmoud Arnaout (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Adel Baterjee, Muzaffar Khan, Soliman J. Khudeira, and Jamal Nyrabeh, all located, doing business or registered to do business in the United States.

## World Assembly of Muslim Youth

229.    The World Assembly of Muslim Youth (or "WAMY") and the Benevolence International Foundation (BIF) are tightly connected organizations that share the same leadership and work together on a number of joint projects.  Adel Abdul Jalil Batterjee was the Secretary General of WAMY at the time he founded the al Qaeda front organization BIF in the United States.  Outside of Batterjee's role, the two organizations WAMY and BIF have also cooperated in joint-publishing of literature and film that bears both of their logos.

230.    Batterjee commissioned the writing of a biography specifically about Osama bin Laden and the origins of the al Qaeda network in Arabic.  This biography, *The Arab Volunteers in Afghanistan*, was jointly published in 1991 by the Benevolence International Foundation and the World Assembly of Muslim Youth.  The book details Osama bin Laden's life, including the

381

creation of bin Laden's terrorist network, al Qaeda. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river." *Arab volunteers in Afghanistan.*

231.    The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught. Ahmad Ajaj had in his possession an al Qaeda manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert. It was found in an envelope that had both the WAMY and Lajnat al-Birr logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.

232.    Khalid al-Fawwaz, a senior al Qaeda leader currently imprisoned in The United Kingdom, had the same manual as Ajaj except for updates that included more recent al Qaeda knowledge. Al-Fawwaz ran Osama bin Laden's public relations organization the Advice and Reformation Committee in London and masterminded the 1998 United States Embassy bombings, for which he was indicted by the United States government. That someone of al-Fawwaz' stature in al Qaeda possessed manuals that were distributed by WAMY is indicative of the shared ideology and cooperation between WAMY and al Qaeda.

233.    Another manual found in Ahmed Ajaj's possession was hate literature against Americans, Christians, and Jews. This encyclopedia, which glorified the hijacking of busses and the killing of innocent civilians in Israel, was published by WAMY.

## International Islamic Relief Organization

234.    The International Islamic Relief Organization (or "IIRO") has materially supported terror around the globe, including Osama Bin Laden and al Qaeda. IIRO's office in the Philippines is headed by Osama bin Laden's brother-in-law, Defendant Mohammed Jamal Khalifa and has acted as a center of terrorist financing and training activity – across the globe.

IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting al Qaeda members around the globe.  IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

235.   The IIRO sister company, International Relief Organization (or "IRO"), sends money back and forth with IIRO.  IRO sends money to other organizations that sponsor terror. Another IIRO sister company, the Success Foundation, sends money back and forth with the IIRO and IRO.  The Success Foundation also sends money to other organizations who sponsor terror.

236.   Several employees of the Muslim World League, IIRO's parent organization, have explicitly worked with al Qaeda.  Osama bin Laden's associates from Afghanistan infiltrated and propagated Muslim World League Offices around the world.  The Rabita Trust, another branch of the Muslim World League, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury.  Wa'el Jalaidan, as Secretary General of the Rabita Trust and Muslim World League Office in Peshawar, Pakistan has repeatedly aided and abetted terrorists.  Jalaidan has been branded a SDGT by the United States Treasury Department and his assets have been frozen.  The Treasury Department described Jalaidan as follows at his designation as a terrorist entity:

> Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

237.   Abdurahman Alamoudi, the Secretary of the Success Foundation, has openly stated his support for HAMAS and Hizbollah, both designated terrorist organizations.  Alamoudi is the President of the American Muslim Foundation (or "AMF"), which receives thousands of

dollars from the Success Foundation, as stated on the income tax Form 990s for the Success Foundation. Mohammed Omeish, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based Success Foundation, is also Vice-President of the American Muslim Foundation.

238. Adnan Basha, IIRO's Secretary-General, wrote "The major finance is coming from the generous people of Saudi Arabia, King Fahd, and the royal family." Arafat El-Ashi, head of IIRO's Canada branch, testified in the trial of Mahmoud Jaballah that IIRO and MWL were intimately connected to and funded by certain Saudi Arabian interests. Arafat el-Ashi stated in his testimony in the Jaballah trial that as a IIRO and MWL employee, he considered himself an employee of the Saudi government.

239. According to the account of Mohammed Bayazid, al Qaeda member and associate of Osama bin Laden, the Muslim World League opened an office in Pakistan for the use of the founders of al Qaeda. The Muslim World League initially was funded by Osama bin Laden, then the government of Saudi Arabia took over the funding. According to the Arabic periodical publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with Osama bin Laden's al Qaeda organization. As one example, the IIRO supported an al Qaeda guest house in Egypt.

240. The perpetrators of the first attack on the World Trade Center in 1993 were given al Qaeda funding and support through Defendants Mohamad Khalifa and IIRO. Mohamad Khalifa, as the head of IIRO, used the organization to collect and launder money for al Qaeda operations. IIRO funded the terrorist al Qaeda groups Moro Islamic Liberation Front (or "MILF") and the Abu Sayef Group (or "ASG"). A former Abu Sayyaf member stated: "Less than 30% of the IIRO funds went to legitimate public works, the rest going toward the purchase of weapons." Mohamad Khalifa's branch of the IIRO served as a base to plan and finance al Qaeda and international terrorism.

241.   IIRO built its office in Khartoum, Sudan in the same residential neighborhood as Osama bin Laden's personal office, according to the testimony of a former al Qaeda member, Jamal Ahmed Mohammed Al-Fadl.   IIRO also built its Khartoum office near the office of Benevolence International Foundation, another al Qaeda front, and in the same residential neighborhood where Osama bin Laden had his personal office.

242.   The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998.   Kenya deregistered the IIRO after the bombing.   IIRO Tanzania was reportedly working with al Qaeda immediately before the United States Embassy bombing. IIRO went on to plot to destroy United States Consulates in India in 1999.

243.   According to Canadian intelligence documents, IIRO funded al-Jihad.   Mohmous Jaballah, an Islamic al-Jihad member tried in Canada, was an IIRO employee.   Egyptian al-Jihad, led by al Qaeda's second-in-command, Ayman al-Zawhiri, is a branch of al Qaeda.   As an employee of IIRO Canada, Mohammed Khatib founded the Canadian branch of Benevolence International Foundation.

244.   IIRO works with numerous other al Qaeda affiliated charities.   IIRO shares the same address in The United Kingdom as the International Development Foundation (or "IDF"), a charity affiliated with Defendant Khalid bin Mafouz, a senior al Qaeda financier.   The Success Foundation, IIRO's namesake, is also funded by Khalid bin Mafouz.   IIRO aids and abets the Saudi Joint Relief Committee, an al Qaeda charity in Bosnia and elsewhere.   IIRO, through Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaeda charity front.   IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with al Qaeda:   Global Relief Foundation (or "GRF"), Taibah International, Islamic African Relief Agency, World Assembly of Muslim Youth, (or "WAMY").

245.   Mohammed Omeish is Vice President of American Muslim Foundation which according to its tax Form 990, filed in 1999, gave money to Tarik Hamdi.  Tarik Hamdi helped Osama bin Laden get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.

246.   After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of al Qaeda sponsorship.  One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed.  IIRO also extensively funded the Taliban regime.  As stated by Dr. Adan Basha, Secretary-General of IIRO, the IIRO donated more than Sixty Million ($60,000,000) dollars to the Taliban Regime.  The Taliban Regime was a known material sponsor, aider and abettor of al Qaeda terrorists.  After September 11, 2001, Pakistan deported 89 Arab aid workers from the IIRO and other organizations because they were aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaeda.

247.   Sanabil al-Khair was created to manage the International Islamic Relief Organization's financial assets.  IIRO's website states, "It [IIRO] has established an endowment fund (Sanabil Al-Khair) which will be used to generate a stable income to finance its various activities."  The Sanabil al-Khair has incorporated in the United States under two different names:  The Sana-Bell, Inc. and Sanabel al-Kheer, Inc.  Their corporate records indicate the same address as IIRO in Herndon, Virginia.

248.   Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the International Islamic Relief Organization include Defendants:  Success Foundation, Inc., Mohamed S. Omeish, Abdurahman Alamoudi, Khaled Nouri, Sulaiman al-Ali, Abdullah M. al-Mahdi, Tareq M. al-Swaidan, Abdul al-Moslah, Salah Badahdh, Abdullah bin Saleh al Obaid, Hassan A.A. Bahfzallah, and M. Yaqub Mirza, all located, doing business or registered to do business in the United States.

## The Muslim World League

249.   The Muslim World League was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." The Muslim World League (or "MWL") is the parent organization of the charity IIRO.   MWL uses the IIRO as an operational arm to perform many of its charitable activities.

250.   The Muslim World League is an organization funded, supported, and financed by persons or entities of Saudi Arabia.   According to the testimony of Arafat al-Asahi, a MWL representative in Canada:

> Q.   During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?
>
> A.   Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.
>
> Q.   I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?
>
> A.   I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?
>
> Q.   Yes.
>
> A.   Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.
>
> Q.   Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?
>
> A.   Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.
>
> Q.   When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?
>
> A.   What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

251. The Muslim World League has at least two offices in the United States. The New York City office is currently active, while its main office in Herndon, Virginia, was the target of federal raids in early March 2002. Its officers at the Virginia office are President Abdullah bin Saleh al-Obaid, Vice President Hassan A. A. Bahafzallah, and Secretary/Treasurer Yaqub M. Mirza.

252. Abdullah al-Obaid, President of the United States branch of MWL, and former Secretary-General of the organization, also runs one of the al-Rajhi family's largest corporations, al-Watania. The al-Rajhi family is the primary funder of the entire SAAR Foundation Network. Adullah al-Obaid also served as Secretary-General of the Rabita Trust.

253. Yaqub Mirza, the secretary and treasurer of the MWL in the United States, is the financial mastermind of the SAAR Network. Yaqub Mirza's house was raided in March, 2002 by federal authorities investigating his alleged connections to al Qaeda and September 11, 2001.

254. The Muslim World League has numerous connections with al Qaeda operatives. Mohammed Bayazid, an al Qaeda operative who fought alongside Osama bin Laden and the other mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for al Qaeda), described how Defendant Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda:

> Brother Jamal Khalifa (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullah Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely.

255. Wa'el Jalaidan, whom the United States Treasury Department named as "one of the founders of al Qaeda," headed the Muslim World League in Peshawar, Pakistan and also served as the Secretary-General of the Rabita Trust. Jalaidan has been branded a Specially Designated Global Terrorist Entity (or "SDGT") by the United States Treasury Department and

his assets have been frozen. The Treasury Department also characterized Jalaidan as having "directed organizations that have provided financial and logistical support to al-Qa'ida." Wa'el Jalaidan operated Muslim World League offices around the world. These offices served in the early days of al Qaeda to attract and train holy warriors for the war in Afghanistan.

256.    Wadih el-Hage, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the Muslim World League in Peshawar, Pakistan in the 1980s. It was while working at the Muslim World Leage that el-Hage met Abdullah Azzam, the mentor of Osama bin Laden, and a co-founder of al Qaeda.

257.    Ihab Ali, another al Qaeda operative in prison in the United States on perjury charges, also went to work for the Muslim World League in 1987. Ihab Ali played a large role in the embassy bombings, facilitating communication between Osama bin Laden and other al Qaeda members and also piloting Osama bin Laden's personal jet. In 1993, Ihab Ali took flight lessons at the Airman Flight School in Norman, Oklahoma—the same school Zacarias Moussaoui attended and which Mohammed Atta scouted as a possibility for his flight training.

258.    According to the grand jury, Ihab Ali did not disclose the extent to which his pilot training and international travels concerned efforts to assist in al Qaeda's terrorist activities.

259.    In conjunction with the attempted assassination of Egyptian President Hasni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought our travel tickets and gave us spending money before we arrived at the [Osama bin Laden's] farm in Suba region in southern Sudan."

260.    Co-conspirators, aiders and abettors of the Muslim World League (a/k/a Rabita al-Alam al-Islami, a/k/a Islamic World League), include Defendants:  Muslim World League, Abdullah bin Saleh al-Obaid, Hassan A.A. Bahafzallah, and Yaqub M. Mirza, all located, doing business or registered to do business in the United States.

### The SAAR Foundation

261.    The SAAR Foundation was named after Sulaiman Abdul Aziz al-Rajhi, head of the Saudi Arabian al-Rajhi family, and was formed in the 1970s by a group of Muslim scholars and scientists from the Middle East and Asia.  SAAR was incorporated in Herndon, Virginia as a 501c(3) non-profit organization on July 29, 1983, and dissolved as of December 28, 2000.  The Saudi Arabian al-Rajhi family is the foundation's biggest donor.  The SAAR Network financially supports terrorism and its main contributors, the al-Rajhi Family, has a long history of same.

262.    Virginia Secretary of State Corporate Records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses in Herndon, Virginia.  Most of these organizations do not maintain a physical presence at that address, or elsewhere.  The SAAR Foundation and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for extremist Islamic terrorist organizations.

263.    On March 20th and 21st, 2002, the offices of many SAAR Network organizations, along with the residences of their top executives, were raided by the joint terrorism task-force, Operation Greenquest.  Operation Greenquest was created after September 11, 2001, by the United States Treasury Department as a new multi-agency financial enforcement initiative bringing the full scope of the government's financial expertise to bear against sources of terrorist funding.  According to the search warrants issued at nearly twenty locations, the SAAR Network was raided for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including) Osama bin Laden."

264.    The SAAR Foundation reported revenues of over $1.7 billion for the year 1998, which represents more than any other United States charity has ever generated.  The SAAR Foundation and its affiliated charities keep a low profile in that they do not conduct fundraising events or publicly reach out to potential donors like most charities.

265. On November 7, 2001, Bank al-Taqwa was first designated by President George W. Bush's Executive Order as a Specially Designated Global Terrorist Entity and the United States Department of Treasury and its assets were frozen. Two SAAR Network executives, Samir Salah and Ibrahim Hassabella, were both former executives at Bank al-Taqwa. Two other executives in the SAAR Network, Jamal Barzinji and Hisham al-Talib, worked for Youssef M. Nada, the head of Bank al-Taqwa who also had his assets frozen. The SAAR Network links with Youssef Nada include that Sulaiman al-Rajhi was on the Board of Directors at Youssef Nada's Akida Bank in the Bahamas. People associated with the SAAR Foundation and its network were also implicated in the United States Embassy terrorist bombings in Kenya and Tanzania.

266. The SAAR Network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of al Qaeda and international terror. These organizations are closely inter-twined with Defendants IIRO, Muslim World League and their related "charities." The connections between the al-Rajhi family, the SAAR Network, and the terrorist front-groups extends past the financial network to a repetitious pattern of overlapping officers. The United States branches of the Muslim World League and its subsidiaries are a part of the SAAR Network. The Muslim World League and SAAR share officers and addresses. They are analogous to the SAAR Network in that they play an intermediary role between wealthy Saudi financiers and terrorist groups.

267. Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR Network include Defendants: Abu Sulayman, Ahmed Totonji, Hisham al-Talib, Iqbal Yunus, Jamal Barzinji, M. Omar Ashraf, Mohammed Jaghlit, Muhammad Ashraf, Taha Jaber al-Alwani, Tarik Hamdi, Yaqub Mirza, Sherif Sedky, African Muslim Agency, Aradi, Inc., Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mar-Jac Poultry, Inc., Mena Corporation, Reston Investments, Inc., SAAR