509.   In 1985, Zouaydi formed Mushayt for Trading Establishment in Jeddah, Saudi Arabia, as a household gifts company, and owned it at least until the end of 1998. The company was controlled at all times relevant by members of the Muslim Brotherhood, including current General Manager, Walid Al Zaim.

510.   In or about 1996, Zouaydi met Bassam Dalati Satut, Imad Eddin Barakat Yarkas and Ghasoub El Abrash Ghalyoun in Spain and Saudi Arabia. He also met Mamoun Darkazanli, an al Qaeda terrorist and co-conspirator, in Saudi Arabia. During his stay in Saudi Arabia, Zouaydi was in frequent contact with members of the Muslim Brotherhood, Saudi and Syrian businessmen, and several Saudi scholars and religious leaders. Zouaydi attended meetings and had contacts with representatives of extremist organizations linked to Osama bin Laden, including those in the Philippines.

511.   In December 1998, Zouaydi settled in Spain and created several businesses with individuals who are part of an al Qaeda cell in Spain. Between 1999 and 2001, Zouaydi frequently traveled to Saudi Arabia, Turkey, and in at least one instance to the United States.

512.   From 1996 to 2001, the al Qaeda network in Europe received at least $1,093,197 dollars from Zouaydi's Saudi company "donations" and false contracts issued by Spanish companies owned by Zouaydi. These front companies, mainly involved in construction and real estate, were convicted in arms trafficking, credit card fraud and false documentation. They made false financial statements and laundered at least $2.5 million dollars over five years.

513.   Since 1999, money was funneled to the Hamburg al Qaeda cell through businessmen Mahmoud Darkazanli and Mohammed Haydar Zammar who provided this cell of hijackers with financial, logistical and material support.

514.   The financial and support network formed by Zouaydi in Spain engaged in relations with other al Qaeda cells in Belgium, Italy, Germany, the Philippines and Indonesia in furtherance of a common scheme, plan, course or pattern of conduct, criminal and civil

conspiracy, and racketeering enterprise to aid, abet, or otherwise materially sponsor and promote acts of international terrorism.

515.   Muhammed Galeb Kalaje Zouaydi is considered by Spanish government as the main benefactor of al Qaeda in Europe in preparation of the September 11, 2001 attacks. Between 1995 to 2000, Muhammed Galeb Kalaje Zouaydi received large amount of money from Saudi Arabia, in order to conduct investments, and provide logistical assistance and support to al Qaeda.

516.   Muhammed Galeb Kalaje Zouaydi (or "Zouaydi") resided between Saudi Arabia and Spain, when he created with Ghasoub Al Abrash Ghalyoun, a money laundering scheme to assist al Qaeda operations.   Zouaydi has close financial ties with Defendants Prince Turki al Faisal al Saud and Prince Mohammed al Faisal al Saud.

517.   Zouaydi organized Spanish and Saudi Arabian businesses with Ghasoub Al Abrash Galyoun.   These companies included the real estate company Promociones y Construcciones Tetuan Pricote S.A., located in Madrid.   This company is related to Abrash Company, located at the same address, and to Contratas Gioma S.A., also chaired by Ghasoub Al Abrash Galyoun.   Several other companies are located at the same address and purport to be involved in industrial building construction.   Those entities are related to the operations of September 11, 2001 attacks and furnished logistical and material support to the al Qaeda Spanish branch.

518.   All the companies located at the 33 Ana Maria Street in Madrid, and owned by Ghasoub Al Abrash Galyoun, received millions of dollars from Muhammed Galeb Kalaje Zouaydi. The financing used for the functioning of those companies was provided to Zouaydi from Saudi Arabia.

519.   To attempt to legitimize as well as cover-up this sponsorship of al Qaeda and international terrorism, false contracts were signed with Zouaydi's Saudi Company, Mushayt for

448

Trading Establishment. Mushayt for Trading Establishment is a company chaired by Mohamed Ali Mushayt was founded by Muhammed Galeb Kalaje Zouaydi in order to transfer funds for al Qaeda operations in Europe.

520.   In addition, Mushayt for Trading Establishment in Jeddah, Saudi Arabia, sheltered and materially and economically supported Nabil Nanakli Kosaibati Nabil, who was convicted for terrorist activities in Yemen. Each month, the Mushayt for Trading Establishment payed wages to Nabil Nanakli Kosaibati Nabil. Mushayt for Trading Establishment in Jeddah shares the same administrative infrastructure, phones, telexes, with a company named Mohammed Ali Sayeed Mushayt, chaired by Abdull Aziz Bin Abdullah, and also located in Jeddah. Those two companies operated money transfers to develop Spanish companies as fronts for the financing of international terrorism generally and al Qaeda specifically.

521.   Mushayt for Trading Establishment materially and financially supported Mohamed Atta's al Qaeda cell and settlement in Hamburg, Germany. Abdul Fattah Zammar and Mamoun Darkanzali (a/k/a Abu Ilias) provided Atta with material and financial support to organize the September 11, 2001 attacks.

522.   Muhammed Galeb Kalaje Zouaydi sent $227,000 dollars to Nabil Sayadi in Belgium through Mushayt for Trading Establishment. Nabil Sayadi is also a radical Muslim extremist in charge of the Fondation Secours Mondial and Defendant Global Relief Foundation in Belgium.

523.   From 1996 to 2001, estimates of amounts personally donated by Muhammed Galeb Kalaje Zouaydi to al Qaeda logistics in the Europe are $656,022 dollars. Abdalrahman Alarnaot Abu Aljer, leader of the al Qaeda Spanish cell, invested $53,000 dollars in the Zouaydi's company Proyectos y Promociones Iso, registered in Madrid by Bassam Dalati Satut.

524.   Proyectos y Promociones Iso was an umbrella organization for al Qaeda operations in Europe. The "contracts" signed with Mushayt for Trading Establishment and

Muhammed Galeb Kalaje Zouaydi were part of a money laundering scheme to mutually support, aid and abet al Qaeda and international terrorism.  The total revenue of the company Proyectos y Promociones Iso for the year 2000 equalled $2,549,175 dollars.

525.    The company Proyectos y Promociones Iso, registered in Spain, was also used to launder invoices and bills of other members of al Qaeda in Europe.

526.    Bassam Dalati Satut belongs to the Spanish al Qaeda cell headed by Abu Dahdah. Bassam Dalati Satut is also the manager of a company registered as Cobis, located in Madrid. This company materially supported, aided and abetted al Qaeda operations and propaganda.

527.    Kamal Hadid Chaar participated in the material sponsorship and aiding and abetting of al Qaeda through his company Afamia S.L., also located in Madrid. Kamal Hadid Chaar is a Muslim activist, involved in extremist Islamic publications and in al Qaeda activities in Spain.  Abdalrahman Alarnaot is also involved in Afamia S.L., as director.  Kamal Hadid Chaar is the Chief Executive Officer of Afaimia S.L.  Kamal Hadid Chaar facilitated and sponsored the passage of Chej Salah to Peshawar with a false passport registered as Kamal Hadid Chaar.

528.    On July 16, 1996, Mohamed Neel Acaid, a member of the al Qaeda cell in Spain, sent through the Arab Bank the sum of $6,400 dollars to Khalid Ahman Hamdan Alriqib, an extremist associated with Chej Salah in Spain.

529.    All of these companies, entities, and individuals participated in the sponsorship of terror and in the preparation of September 11, 2001 attacks.  They did so with the cooperation of al Qaeda headquarters in Spain, particularly Chej Salah, founder of the Spanish cell and close to Osama bin Laden.

530.    From at least 1995 to 2000, Ghasoub Al Abrash Ghalyoun was actively associated with Muhammed Galeb Kalaja Zouaydi in the financing and material support of al Qaeda and the September 11, 2001 attacks.

531.    The September 11, 2001 attacks were financially and logistically assisted by this European money laundering scheme directed from Saudi Arabia with an epicentre based in Spain. The scheme resulted in the direct, material support of the Hamburg cell of al Qaeda hijackers, including Mohamed Atta and Ramzi Binalshibh.

532.    Through several front companies that served as covers for al Qaeda operations established in Madrid, Spain, al Qaeda sponsors were able to funnel millions of dollars from companies and individuals based in Saudi Arabia to Spain, Germany and other European al Qaeda cells, between 1995 and 2001.

533.    While the organizations and companies were supposedly involved in construction and real estate, they were indicted for arms trafficking, credit card fraud and false documentation. This terrorist funding scheme was directed by Defendants Mohammed Galeb Kalaje Zouaydi, Bassam Dalati Satut, Ghassoub Al Abrash Ghalyoun and Imad Eddin Barakat Yarkas. This scheme was carried out in Saudi Arabia, Spain, Germany, and elsewhere. It is anticipated that additional parties and persons will be implicated by the evidence being analysed regarding this scheme.

534.    Funds for terrorism were funnelled to the Hamburg al Qaeda cell by and through businessmen Mahmoud Darkazanli and Mohammed Haydar Zammar, who both provided the al Qaeda cell of hijackers with financial and logistical support needed to carry out the gruesome attacks of September 11, 2001.

535.    Mustaf Ahmed al-Hisawi (a/k/a Sheikh Saeed) is a Saudi Arabian businessman who facilitated the financial transactions to the terrorists and the al Qaeda cells that committed and planned the atrocities of September 11, 2001. This Defendant is known as one of Osama bin Laden's financial chiefs.

536.   Abdullah bin Abdul Muhsen al Turki (or "al Turki") is a former Saudi, advisor to King Fahd, and Secretary General of the Muslim World League.  Additional specific allegations regarding al Turki's role in the Saudi-Spanish-German al Qaeda scheme are detailed *supra*.

537.   On October 10, 1999, Zouaydi, a senior al Qaeda financier for Europe, and Abdullah bin Abdul Muhsen al Turki, then advisor to King Fahd, agreed to participate as business partners to a construction project in Madrid, Spain.  A contract was written by Zouaydi Company in Spain stating that both parties will finance the project.

538.   Zouaydi was part of an international terrorist movement for global jihad which encompassed the al Qaeda network.  This network channeled money directly to the perpetrators of September 11, 2001, and to similar global jihad movements planning terrorist actions in San Francisco, Bali, and elsewhere.

539.   Several faxes were sent by Zouaydi to al Turki.  In one fax sent on October 15, 1999, Zouaydi asks al Turki to send the money through al Rajhi Bank (which hold his accounts in Saudi Arabia).

540.   As a guaranty for the operation, Zouaydi sent a check of 191 million Pesetas on September 15, 1999, to al Turki as beneficiary from Banco Sabadell in Madrid.  On October 22, 1999, a fax was sent to al Turki by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of al Turki, Waleed O Houssainy, about a project of al Turki to buy 100% of Zouaydi's Spanish company.

541.   On February 4, 2000, Zouaydi sent a fax in furtherance of this scheme to al Turki, referring to him as advisor to King Fahd.

542.   The Spanish scheme provided material support directly to al Qaeda operatives and the September 11, 2001 attacks.  As investigations continue, additional evidence of such schemes will be uncovered.

## Abu Qatada al-Filistini

543.    Abu Qatada al-Filistini (a/k/a Abu Ismail, a/k/a Abu Umar, a/k/a Abu Omar Omar, a/k/a Abu Umr Takfiri, a/k/a Abu Umar Umar, a/k/a Ali-Samman Uthman, a/k/a Omar Mahmoud Uthman, a/k/a Umar Uthman) (or "Abu Qatada,") was born 1960 in the city of Nablus in the Palestinian Territories.    Abu Qatada entered high school in Amman and eventually obtained a degree in religious studies.    Abu Qatada was one of the first Jordanians to join in the war against the Soviet Union.    In Peshawar, Pakistan, Abu Qatada became a disciple of Abdullah Azzam, Osama bin Laden's spiritual mentor and founder of the organization that preceded al Qaeda.    Following Azzam's assassination in 1989, Abu Qatada joined the jihad against the Soviet Union in Jalalabad, Afghanistan.    In 1993 he immigrated to the United Kingdom where he received political refugee status.    From 1994 to 1997, Abu Qatada was considered one of the ideological leaders of the Algerian-based international terrorist group, the Armed Islamic Group (or "GIA").    In 1998, Abu Qatada supported a branch of the GIA, the Salafist Group for Preaching and Combat headed by Hassan Hattlab.

544.    Abu Qatada is a senior agent for Osama bin Laden in Europe.    On October 12, 2001, Abu Qatada was designated as financial supporter of terrorism by President George W. Bush.    Along with the designation was a call for the freezing of Abu Qatada's assets.    At the Department of Treasury news conference that announced the designation of Abu Qatada as a financier of terrorism, Treasury Secretary Paul O'Neill stated:

> The list includes businesses and charitable organizations that funnel money to the al Qaeda terrorist network.

545.    On the day of Abu Qatada's designation, October 12, 2001, the Department of Treasury issued a press release that describes Abu Qatada's role in al Qaeda, using his a/k/a Oman Mahmoud Uthman, which stated in part "Uthman is a senior agent for bin Laden in Europe."

546.    Following his designation as a financier of terrorism by the United States, the United Kingdom froze $260,000 of Abu Qatada's assets.  Government officials from France, Germany, Italy, Spain and Jordan have stated that Abu Qatada was in close contact with al Qaeda agents that were planning international terrorist attacks.

547.    During the 1998 United States Embassy bombings in Africa trial, Abu Qatada was identified as a member of al Qaeda's religious council, known as the Fatwa Committee, that issues religiously acceptable rulings, or fatwas.  On February 6, 2001, the key government witness and al Qaeda member, Jamal Ahmed al-Fadl, testified that al Qaeda maintained a Fatwa Committee and that Abu Qatada was a member of the committee:

> Q. We will come back to the businesses.  Besides the business committee what other businesses were there within al Qaeda?
> A. Fatwah committee and Islamic study.
> Q. The fatwah and Islamic study committee.  Can you tell us who was on the fatwah committee.
> ...
> Q. Did you ever attend meetings where member so the fatwah committee spoke about the fatwas issued by al Qaeda?
> A. Yes.
> Q. Were the members of the fatwah committee identified by the members of al Qaeda?
> A. Yes.
> Q. Can you tell to the jury who the member of the fatwah committee were?
> ...
> Q. Tell us who else was on the fatwah committee.
> A. Abu Faraj and Abu Qutada and Abu Ibrahim al Iraqi Hajer, Dr. Fadhl el Masry, and Dr. Abdel Omez.

548.    Abu Qatada is still fulfilling the role of al Qaeda's Fatwa Committee by justifying the September 11, 2001 attacks.  Abu Qatada wrote a ten page document that glorified Osama bin Laden and detailed the "moral" justification for the attacks of September 11, 2001. Distributed widely on emails and posted on a number of extremist websites in October 2002, Abu Qatada's document is titled, "The Legal Vision for the September 11 Events."

549.    Abu Qatada was convicted twice by Jordan for his involvement in terrorism. In April 1999, Abu Qatada was sentenced to life imprisonment by a Jordanian military court. In March 2000, Jordan once again tried and convicted Abu Qatada for his role in aiding terrorism. This time, however, he was involved with a group of individuals identified by Jordan as members of al Qaeda. Abu Qatada was sentenced to death in absentia, along with the twenty-eight other accomplices. The charges levied against him were for planning terrorist activities on behalf of al Qaeda. More specifically, he was indicted on account of a) plotting terrorist actions; and b) memberships in an unauthorized group. The terrorist operations were directed against tourist attractions and American interests in Jordan and were timed to coincide with the Millennium. Abu Qatada is an aider, abettor, co-conspirator, and/or material supporter of international terrorism, al Qaeda and Osama bin Laden. Abu Qatada was arrested on October 24, 2002, by British authorities during an armed raid on his residence.

### Mohammed Hussein al-Amoudi

550.    Mohammed Hussein Al-Amoudi ("Al-Amoudi") is a partner of Defendant Khalid bin Mahfouz in a number of businesses. Al-Amoudi is partner of bin Mahfouz in the oil business through Nimir Petroleum and Delta Oil. Al-Amoudi is a Saudi-Ethiopian.

551.    Al-Amoudi was a Director of the al-Haramain branch in Kenya. The al-Haramain Islamic Foundation is a Saudi Islamic charity that has exploited its non-profit status for the benefit of Osama bin Laden and the terrorist network al Qaeda as described in detail *supra*. Two of these branches, Bosnia and Somalia, have already been designated by the United States government as terrorist entities and their assets have been frozen. The leaders of al-Haramain have direct links to al Qaeda and international terrorism.

552.    The al-Haramain Islamic Foundation was banned in Kenya, along with five other NGOs, following the 1998 Embassy bombings. Osama bin Laden and al Qaeda were convicted

by the United States in 2001 for plotting and executing these dual attacks in Kenya, and Tanzania, which killed 224 people, and injured more than 4,000.

553.    Al-Amoudi is an aider, abettor, co-conspirator, and/or material sponsor of international terrorism, al Qaeda, and Osama bin Laden.

### Yassir al-Sirri

554.    Yassir al-Sirri (a/k/a Abu Ammar) (or "al-Sirri") was born in Egypt in 1963 and joined the radical Islamic movements eminating from the region.  As a teenager, he was frequently arrested by Egyptian authorities and was refused entry into the Egyptian army for security reasons.  He went to Yemen in 1988.

555.    After being tried in absentia for the attempted assassination of Prime Minister Atef Sedki in 1993, al-Sirri was sentenced to death in Egypt.  Al-Sirri fled from the Sudan, where he was currently residing, to the United Kingdom and requested political asylum.  There he established the radical Islamic Observation Center, which releases al Qaeda messages and reports about its members.

556.    After September 11, 2001, Yassir al-Sirri was again arrested in the United Kingdom for his alleged participaction in the assassination of Ahmed Shah Masood, the Afghan warlord who led the North Alliance against the Taliban.  He was later released, unconvicted. The United States has requested extradition of Yassir al-Sirri for his role in providing material support to Gama'a al-Islamiyya, Omar Abdel Rahman's jihadist organization that is part of the al Qaeda network.

557.    In April of 2002, al-Sirri was indicted and charged with providing material support to Gama'a al-Islamiyya (IG), a designated terrorist group with numerous ties to al Qaeda.

558.    Yassir al-Sirri solicited, commanded, induced and otherwise endeavored to persuade other persons to engage in violent terrorist operations worldwide.

559.  In December 2000, al-Sirri arranged for money to be sent to Omar Abdel Rahman's son, Ahmed Abdel Rahman. The younger Rahman was in Afghanistan with al Qaeda when he relayed the request for the money. The criminal indictment explains:

> In or about December 2000, SATTAR spoke with one of Sheikh Abdel Rahman's sons, Ahmed Abdel Rahman, a/k/a "Sayfallah," who is a co-conspirator not named as a Defendant herein, and was in Afghanistan with al Qaeda, regarding the need for SATTAR to transfer money to him.
> On or about May 6, 2001, SATTAR spoke by telephone with AL-SIRRI and agreed that, because SATTAR could not send the money to Ahmed Abdel Rahman directly in Afghanistan, AL-SIRRI would arrange for an individual to transport the money to Ahmed Abdel Rahman.
>
> On or about May 8, 2001 SATTAR spoke with AL-SIRRI to finalize the money transfer to Ahmed Abdel Rahman through the director of a boys' school in Afghanistan.
>
> On or about May 14, 2001, SATTAR spoke by telephone with Ahmed Abdel Rahman who told SATTAR that there had been some confusion and that Mohammed Abdel Rahman had received the money sent by SATTAR.

560.  The United States extradition warrant alleges that al-Sirri "sent money to Afghanistan in May 2001, 'knowing or having reasonable cause to suspect that the money would or may be used for the purpose of terrorism within the jurisdiction of the government of the U.S.A.'"

## The Advice and Reformation Committee (ARC) and
## The Committee for the Defense of Legitimate Rights (CDLR)

561   The Advice and Reformation Committee (or "ARC") and the Committee for the Defense of Legitimate Rights (or "CDLR") are both Saudi-dissident groups with ties to Osama bin Laden. Both organizations seek to overthrow the Saudi government to replace the regime with an even more strict brand of Islam. The ARC in London was headed by Khalid al-Fawwaz (or "al-Fawwaz"), and the CDLR in London is headed by Mohammed al-Massari. The ARC branch in the United States was set up by al-Massari's wife, Lujain al-Iman, providing a link between ARC and CDLR.

562.    These two organizations have disseminated al Qaeda and Osama bin Laden's propaganda throughout their existence and served to further the violent goals of radicals and terrorists against the United States.  Al-Fawwaz has been indicted in the U.S., and the United States has requested his extradition for his prominent role in setting up the al Qaeda infrastructure that allowed the embassy bombings in East Africa to occur in 1998.  Two al Qaeda operatives, Ziyad Khaleel and Tarik Hamdi, have been involved with both the CDLR and the ARC.

563.    Al-Massari, along with his wife al-Iman, also headed the now-dissolved Action Committee for the Rights of Middle East Minorities, located in Denver, Colorado.

564.    The ARC was established in 1994 at the behest of Osama bin Laden.  The then Arab student named Khalid al-Fawwaz was chosen to run the center, ostensibly for the peaceful reform of Saudi Arabia, according to its constitution.  In reality, though, ARC served as al Qaeda's base in The United Kingdom, plotting and promoting international terrorism.  The indictment of al-Fawwaz and Osama bin Laden and the others involved in the Embassy bombings plot describes:

> In or about 1994, the Defendant USAMA BIN LADEN, working together with KHALID AL FAWWAZ, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," set up a media information office in London, England (hereafter the "London office"), which was designed both to publicize the statements of USAMA BIN LADEN and to provide a cover for activity in support of al Qaeda's "military" activities, including the recruitment of military trainees, the disbursement of funds and the procurement of necessary equipment (including satellite telephones) and necessary services.  In addition, the London office served as a conduit for messages, including reports on military and security matters from various al Qaeda cells, including the Kenyan cell, to al Qaeda's headquarters.

565.    Al-Fawwaz employed Ziyad Khaleel, a student in Columbia, Missouri, whom the FBI described as a "procurement agent" for bin Laden, and whose job was to "procure

computers, satellite telephones and covert surveillance equipment," according to an FBI memo, for al Qaeda.

566.    In 1996, al-Fawwaz tasked Ziyad Khaleel with purchasing a satellite phone needed for al Qaeda's communication network.   That phone became instrumental in the Wmbassy bombings and was used by Osama bin Laden himself to dictate orders and relay information.

567.    As Assistant United States Attorney stated during the Embassy bombings trial:

> It is the phone that is used by the headquarters people in Afghanistan . . .
> And who they call on that phone and who has that number tells you a
> great, great deal about the activities of the people in this case.

568.    The prosecutors of the case maintained that Khaleel sent the phone to al-Fawwaz, who then sent it to Afghanistan.   By 1998, the phone had been used for hundreds of calls, and the number for the phone appeared in the personal phone directories of terrorists in Egypt and Kenya.

569.    Also by 1998, Khaleel had ordered more than 2,000 minutes of phone time for the phone, and then would in turn be reimbursed by al-Fawwaz directly.

570.    The indictment additionally explains the role of the satellite phone:

> From at least as early as 1995 until September 1998, the Defendant
> KHALID AL FAWWAZ provided the Defendant USAMA BIN LADEN,
> as well as other al Qaeda members, with various means of
> communications, including a satellite telephone ("Bin Laden Satellite
> Telephone"), for the purpose of facilitating communications between al
> Qaeda members and associates.

571.    Phone records show that the highest ranking al Qaeda members in Kenya in 1998 placed calls to Saudi Arabia and other gulf states in furtherance of their terrorist enterprise.

572.    Wadih el-Hage made phone calls on behalf of Osama bin Laden and al Qaeda in furtherance of their international terrorist enterprise and scheme.   Similarly, the use of wire transfers by al Qaeda operatives and supporters was and is done in violation of RICO.

573.    Khalid al-Fawwaz is a top al Qaeda member, also indicted for his role in the 1998 Embassies bombings in the same indictment as Osama bin Laden.  Khalid al-Fawwaz helped establish the infrastructure and support system that aided al Qaeda to carry out the attacks. Numerous phone calls from Africa to Saudi Arabia and other gulf states were made on his mobile phone in furtherance of this scheme.

574.    The United States subsequently indicted al-Fawwaz for his role in the bombing and currently awaits extradition to the United States, while remaining imprisoned in The United Kingdom.   Ziyad Khaleel left the country and probably resides currently in Saudi Arabia, although his whereabouts are unknown.

575.    Al-Fawwaz aided in the creation of Bin Laden's famous 1996 Declaration of War Against the West.  He then vouched for its authenticity and released it to the media, through the Committee for the Defense of Legitimate Rights.  The indictment explains:

> On or about July 31, 1996, the Defendant KHALID AL FAWWAZ created, using a computer in his residence in London, England, a file entitled "the Message"

> On or about August 23, 1996, a Declaration of Jihad indicating that it was from the Hindu Kush mountains in Afghanistan entitled "Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula" (hereafter the "Declaration of Jihad") was disseminated;

> In or about August and September 1996, the Defendant KHALID AL FAWWAZ maintained in a computer in his residence computer file copies of the "Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula";

> In or about August or September 1996, the Defendant KHALID AL FAWWAZ forwarded a copy of USAMA BIN LADEN's Declaration of Jihad to another person in England for further dissemination to the media for publication and thereafter KHALID AL FAWWAZ vouched for the Declaration's authenticity.

576.  Wadih el-Hage visited al-Fawwaz and admitted that al-Fawwaz also worked for Osama bin Laden.  Wadih el-Hage, while testifying in front of a grand jury, noted that Fawwaz worked for bin Laden:

> Q.  Do you know Khalid Al Fawwaz?
> A.  Yes.
> Q.  Is he in London?
> A.  Yes.
> Q.  Does he work for Usama Bin Laden?
> A.  Yes.
> Q.  How long do you know Khalid Al Fawwaz?
> A.  Since '95 when I visited London.

577.  The ARC Branch in the United States facilitated communication with Osama bin Laden and al Qaeda.  The ARC branch in the United States had its address in Denver, Colorado.  The post office box was registered by Lujain al-Iman, the wife of CDLR's Mohammed al-Massari.  In 1994, al-Massari asked al-Iman to set up an MCI 800 number in Denver for the ARC to allow the organization to communicate between Saudi Arabia and The United Kingdom without getting caught by Saudi authorities, according to al-Massari.

578.  After the phone system was set up, Osama bin Laden called al-Massari personally to thank him, according to al-Massari.  Al-Iman said that she knew that al Fawwaz, the head of ARC, worked for Osama bin Laden, when she set up the phone line, but thought that al-Fawwaz was just "a human rights activist."

579.  This address was also shared by the International African Relief Agency (or "IARA") and Ziyad Khaleel, who as explained *supra*, was a student in Columbia, Missouri, whom the FBI described as a "procurement agent" for Osama bin Laden, and whose job was to "procure computers, satellite telephones and covert surveillance equipment" for al Qaeda.

580.  CDLR's United States Branch is registered to a known al Qaeda operative.  In the radical Arabic publication, *Al-Zaytuna*, an advertisement for CDLR listed in its contact

information a telephone number that is registered in Tarik Hamdi's name.  Tarik Hamdi has specific ties to Osama bin Laden and al Qaeda.

581.    Well after Osama bin Laden had openly declared war against Americans in 1996, Tarik Hamdi purchased and arranged for the delivery of a battery for the satellite phone that Ziyad Khaleel purchased and that Osama bin Laden used to coordinate international terrorism attacks.  Hamdi also arranged for an interview that ABC News had with Osama bin Laden in 1998, the apparent cover for his involvement in procuring the battery for the satellite phone. Tarik Hamdi wrote a note to Khalid al-Fawwaz, calling him "Brother Khalid," indicating a more than professional relationship.    Assistant United States Attorney Kenneth Karas, in the government's closing statements in the embassy bombings trial, described the whole process of obtaining the satellite phone for the use of al Qaeda and both Ziyad Khaleel and Tarik Hamdi's involvement:

> How else do you know that this is the phone that is used by Bin Laden and others in Afghanistan?  Well, at some point in 1998 Ziyad Khalil puts a purchase order in for a battery pack to Ogara.
>
> This is an invoice from Ogara, and you see on the top left there, "Customer:  Ziyad Khalil," and you see that what he is purchasing is the ultra light power supply and the 12VDC mini battery charger.  Only Ziyad Khalil does not have it sent to him, he asked, ship to, Tariq Hamdi in Herndon, Virginia.
>
> The battery pack goes from Ziyad Khalil requesting it to shipping it to Tariq Hamdi, to Tariq Hamdi going to Pakistan, and then Afghanistan, where he delivers the battery pack for the phone.
>
> And the intermediary in all of this is Khalid al Fawwaz, because he's the guy whose paying Ziyad Khalil for the minutes and he's the guy who arranges for the interview with ABC News and he is the guy getting the message from Tariq Hamdi, the person who delivers the packet.

582.    Tarik Hamdi knew both Ziyad Khaleel and al-Fawwaz, and knew them intimately enough that they trusted him to both obtain materials for them as well as arrange an interview with Osama bin Laden.

583. Tarik Hamdi also worked at International Institute of Islamic Thought (or "IIIT"), located at 555 Grove Street, Herdon, Virginia, the central address surrounding the SAAR Foundation raids, evidence and investigation.

584. The CDLR posted Osama bin Laden's Declaration of War on October 12, 1996. CDLR used the email address 100043.1420@CompuServe.com to post Osama bin Laden's Declaration of War against the West on the Muslim Students' Association's listserve, the "MSA News."

585. The preamble to this posting by CDLR indicates an intense hatred for the West and full support for Osama bin Laden as follows:

> Find below the first part of a very accurate translation of the "DECLARATION OF WAR" issued by the Mujahid Brother Sheikh Usama Bin Muhammad Bin Ladin concerning the illegitimate presence of the American occupation forces in the Arab Peninsula (The Land of the two holy sanctuaries).
>
> I believe it is a significant historic document and that you have the right to read, analyse and think about it. I stil believe that the Kufr regime of the British and later American agents and puppets, Aal Saud, is the source of the current evil of the occupation. On the other hand Aal Saud and the American occupation have become so intertwined and interconnected as to make it impossible to seperate them. They have become one ORGANICALLY connected evil!!
>
> Read and get ready for JIHAAD!!

The CDLR, the ARC, their officers, agents, employees, and co-conspirators are aiders and abettors engaged in the material sponsorship of al Qaeda, Osama bin Laden and international terrorism.

## Islamic Cultural Center of Milan/Islamic Cultural Center of Geneva

586. According to the Italian investigation of several al Qaeda terrorists arrested in Milan in relation with al Qaeda operations in Europe, the Islamic Cultural Center of Milan (a/k/a Centro Cultural Islamico de Milano, a/k/a Islamic Cultural Institute of Milan, a/k/a Istituto

Culturale Islamico de Milano) (or "ICCM") was extensively used as a cover for terrorist planning, recruiting sponsorship and operations.

587.    The principal suspect arrested in Italy, Essi Sami Ben Khemais, regularly met other suspects at the Islamic Cultural Center of Milan, and used its address to communicate with other members of al Qaeda European cells.

588.    The Islamic Cultural Center of Milan, Milan, Italy, is presided by Abdel Hamid Shaari.   The Center is considered by the United States Treasury Department as "the main al Qaeda station house in Europe," utilized to "facilitate the movement of weapons, men and money around the world."

589.    The Islamic Cultural Center of Milan creation in 1988 was financed by Ahmed Idris Nasreddin, founder and member of the board of Bank al-Taqwa. According to the Italian investigation, Bank al-Taqwa was until recently paying the annual rent of the Islamic Cultural Center in Milan of Twenty-Five Thousand ($25,000.00) Dollars.

590.    Relations between the Islamic Cultural Center in Milan and Bank al-Taqwa also include Sante Abdulawahab Ciccarello, a board member of ICCM that co-founded the branch of Bank al-Taqwa in Bahamas.

591.    According to Swiss prosecutors, Bank al-Taqwa in Switzerland (change in name to Nada Management Organization SA, Lugano, Switzerland), "comprises the most important financial structure of the Muslim Brotherhood and Islamic terrorist organizations."  Its founder, Youssef Nada, is a known international terrorist.

592.    Another director of Bank al-Taqwa, Ahmed Huber, was associated with the Islamic Center of Geneva, Switzerland, just across the border were he was converted to Islam. Ahmed Huber acknowledged publicly that he met with members of Osama bin Laden terrorist network in Lebanon.

593.    The principal financial support of the Islamic Center of Geneva is provided by Defendant Dar Al Maal Al Islami (or "DMI"), controlled by Prince Mohammed al Faisal al Saud.

594.    The Islamic Center of Geneva was established in 1961 by Said Ramadan, son-in-law of Hassan al-Banna. Hassan al-Banna was a founder of the Egyptian Muslim Brotherhood, and co-founder of Defendant Muslim World League in Saudi Arabia in 1962 while he was serving as advisor to King Saud. Hassan al-Banna was also a co-founder of the Bank al-Taqwa branch in Bahamas. After his death in 1995, his son Hani Ramadan became President of the Islamic Center of Geneva.

595.    Hani Ramadan wrote an article defending stoning of women and various corporal sanctions under the guise Islamic law along with even more outrageous statements of violence and hatred. His license as scholar in Switzerland was suspended soon after. Founders of the Islamic Center of Geneva also included Abu al-Hassan Ali al-Nadawi (also a co-founder of Defendant Muslim World League with Said Ramadan).

596.    Another founder of the Islamic Center of Geneva, Muhammad Hamidullah, wrote:

> A struggle cannot be anything except a holy act. All war is forbidden in Islam, if it is not waged for a just cause, ordained by Divine law. The life of the Prophet (Muhammad) provides reference to only three kinds of wars: defensive, punitive, and preventive..... To establish liberty of conscience in the world was the aim and object of the struggle of the Prophet Muhammad and who may have a greater authority in Islam than he? This is the 'holy war' of the Muslims, the one which is undertaken not for the purpose of exploitation, but in a spirit of sacrifice, its sole objective being to make the Word of God prevail. All else is illegal. There is absolutely no question of waging war for compelling people to embrace Islam; that would be unholy war.

597.    Youssef Nada was previously designated by the United States on November 7, 2001, and by the United Nations on November 9, 2001. Ahmed Idris Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002. On August 29, 2002,

the United States designated several additional entities controlled by Youssef Nada and Ahmed Idris Nasreddin stating that "through commercial holdings, [they] operate an extensive financial network providing support for terrorist related activities."

598.    Bank al-Taqwa was designated as a terrorist entity by the United States on November 7, 2001, and the United Nations on November 9, 2001. The United States Treasury Department stated that "Bank al-Taqwa, for which Nasreddin is a director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tunisia's An-Nahda, and Usama bin Laden and his Al Qaida organization."

599.    The Treasury Department reported that Bank al-Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden as of late September, 2001. See, Bank al-Taqwa section *supra*.

600.    Founded in 1991, the Qatar Charitable Society (or "QCS") is a Qatari-based charity that now has offices throughout the world. Outside of its headquarters in Qatar, QCS currently has offices in Albania, Baku, Bangladesh, Bosnia, Dahgestan, Palestine, Pakistan, and Sudan. According to its website, QCS maintains the following mission:

> QCS aims to offer relief and help to orphans, victims of war and disasters by supporting them financially, socially and culturally up to the age of 18. QCS aids widows to meet living expenses particularly those who lost all relatives and friends.

601.    QCS' website is managed by Hashem Hussain. Hashem Hussain is a member of the Qatari Government's Ministry of Municipal Affairs and Agriculture and is both the administrative and billing contact for QCS' website. In August 2001, Qatari Ambassador Ali bin Muhammad al-Usayri conveyed Qatar's commitment to the rehabilitation of Sudan. Al-Usayri announced that the Qatari Government will contribute to Sudan through the efforts of the QCS.

602.    In 1999, the Russian Interior Minister stated that QCS funneled money from Qatar to radical Chechen al Qaeda groups.  In response to this accusation, the Qatari Foreign Minister Hamad bin Jasim bin Jar al-Thani did not deny that Qatar is funding al Qaeda terrorists in Chechnia during a November 20, 1999, *al-Jazeera* television interview:

> Q.  How do you answer these accusations?
> A.  ... The second issue, that of aid, I cannot says there is no aid –
> Q.  Why this aid?
> A.  First of all, we as a government cannot control the aid going abroad, some of which may go for humanitarian goals, and some may start as humanitarian but end up in another way. However, there is no monitoring because people are sympathizing with the Chechen people...

603.    In this interview with *al-Jazeera*, the Qatari foreign minister also betrayed his underlying sympathy in favor of Chechen terrorists:

> A.  ...We as a government may be able to control our sympathy although in the end we are only human beings and Muslims. What we see in Chechnya is painful for us as Qatari, Arab, or Muslim citizens. Therefore we cannot restrain the people's feelings in this regard...

604.    The Qatar Charitable Society's relationship with al Qaeda is very intimate.  From the sharing of senior officers to the funding of al Qaeda attacks, QCS' role has clearly been to serve Osama bin Laden and further his international terrorist aims.

605.    Qatar Charitable Society financially supports al Qaeda.  The QCS' financial support for al Qaeda was demonstrated during the trial of al Qaeda operatives involved in the 1998 United States Embassy bombings in Kenya and Tanzania.  In February 2001, the United States Government's lead witness and former al Qaeda member, Jamal Ahmed Mohamed al-Fadl, testified on QCS' relationship with al Qaeda.  al-Fadl stated that in 1993 he was both a QCS employee and an al Qaeda member.  He also stated that QCS' leader at that time, Dr. Abdullah Mohamed Yusef, was a member of al Qaeda as well, and a member of the Sudanese political group the National Islamic Front (or "NIF") that harbored Osama bin Laden in the early

1990s. When al-Fadl testified on his role with the QCS, he described Dr. Yusef's support of al Qaeda through the QCS:

> A. The guy, he runs a group, he is one of our membership, one of the al Qaeda group membership, and also he is Islamic National Front membership, and he was in Afghanistan. So he helped our people for the travel, documents, and also if some money come from the Gulf area to the organization, he gives the group some money from that money.
>
> Q. So the person that you knew in Afghanistan who was part of your group and part of the Islamic National Front, what was his name?
>
> A. Dr. Abdullah Mohamed Yusef.

606.    That two individuals, Al-Fadl and Dr. Yusef, were both members of al Qaeda and QCS indicates a high-level of coordination between the charity and the terrorist group.    The complicity of QCS with al Qaeda's terrorist acts is noted in Dr. Yusef's funding of an al Qaeda attack through the QCS.  As al-Fadl's testimony states:

> Q. What did you do with him regard to the Qatar charitable organization?
>
> A. He helped the jihad Eritrea group, and also he give $20,000 for one of the attack (sic) outside of Sudan.

607.    Al-Fadl has also stated that QCS aided, abetted and materially supported al Qaeda through non-financial means.  In his second day of testimony, Al-Fadl discussed a meeting of al Qaeda members in 1994 that took place in QCS offices:

> Q.  When was the second meeting?
>
> A.  It's during '94.
>
> Q.  Where was it?
>
> A.  In Jam Qatar Heira. It's Qatar organization.
>
> Q.  Is that the same organization you described yesterday or a different one?
>
> A.  Yes, same one.
>
> Q.  Is that the Qatar Charitable Organization?
>
> A.  Yes.

608.    QCS' history and pattern of conduct is that of furthering the spread of Islamic international terrorism wherever possible.  This underlying goal of the QCS is revealed through its financing of Wahhabi terrorists in the Caucasus region.

609.   In April, 2002, the Azerbaijan Government annulled the registration of the QCS. This action was taken because, as stated by the Azerbaijani Justice Ministry, QCS engaged in activities that "contradict Azerbaijan's national interests." The Justice Ministry went on to say that QCS was targeted because it performed, "damaging activities that violate our national interests, as well as cooperated with terrorist structures and conducted propaganda inciting radical sectarianism, religious hatred and fanaticism."

610.   In 1999, a group of Wahhabi militiamen invaded and took control of three districts of Dagestan, a country neighboring Chechnya. Dagestani police have identified that, the day before the attack, $200,000 were transferred into QCS' account with the Dagestan Commercial Bank. Following the invasion, these funds were distributed to the terrorists. After this event, Dagestani police have been able to identify at least an additional $1,000,000 that QCS transferred to aid the attack against Russia. During this investigation, Dagestani police have determined that there were no records of the funds flowing into and out of the QCS for a number of years.

611.   The Government of Russia's International sponsors of Chechen terrorist list, from 1991-2000, is a comprehensive list of organizations that provided aid or support for terrorist organizations in Chechnya. The Qatar Charitable Society was included on this list.

612.   Ahmed Ali al-Bugainain and Dr. Abdullah Mohamed Yusef are aiders, abettors, agents, co-conspirators and material supporters of Qatar Charitable Society, al Qaeda, and international terrorism.

## Mercy International Relief Agency

613.   The Saudi-backed Mercy International Relief Agency (a/k/a Mercy International, a/k/a Mercy) (or "MIRA") was incorporated in Dublin, Ireland in 1992 with the ostensible purpose of embarking on charitable activities around the world. All the incorporators of the

charity are all of Saudi nationality and listed their address at Makkah, Saudi Arabia. MIRA also has branches in Somalia and Kenya. Its Dublin branch dissolved on January 16, 1998.

614.    MIRA is funded by Saudi businessmen. During the trial of Osama bin Laden's personally secretary Wadih el-Hage, convicted for his role in the 1998 United States Embassy bombings in East Africa, Wadih el-Hage's testimony before a grand jury establishes that MIRA was funded by "Saudi merchants":

> "Q. The grand jury had a couple of quick questions one of which is who funds the Mercy International relief agent in Kenya?
> "A. Some Saudi merchants in Saudi Arabia.
> "Q. Merchants in Saudi Arabia?
> "A. Yes.

615.    An al Qaeda member maintained that MIRA was an al Qaeda charity. L'Houssaine Kherchtou, a 36-year old Moroccan, joined al Qaeda in 1991. He affirmed this in his testimony as a government witness in the United States Embassy bombings trial. He worked for al Qaeda in Kenya, and noted specifically that MIRA served and sponsored al Qaeda's purposes. In his testimony, Kherchtou asserted that several al Qaeda members were workers at MIRA, received identity cards from MIRA, and that the organization was dealing directly with Osama bin Laden himself:

> Q. And during the time that you were in Nairobi were you familiar with a charity or relief organization known as Mercy International Relief Organization?
> A. Yes.
> Q. And were there any al Qaeda people affiliated with the Mercy International Relief Organization?
> A. Let me just.
>   (Witness consults with interpreter)
> A. Yes, the people of al Qaeda they were dealing with the Mercy International.
> Q. Who were those people? Which al Qaeda people were dealing with Mercy International?
> A. Bin Laden, Mohammad Masry.
> Q. Are you talking about the military commander?
> A. Yes.
> Q. Abu Mohammad, are you talking about Saleh lay again?
> A. Yes.

470

Q.   Were there any people inside Mercy International who were part of al Qaeda in the past or the present?

A.   Well, in the past Abu Jamal he was the manager of that relief agency but he was in the past of al Qaeda.

Q.   You said Abu Jamal?

A.   Yes.

Q.   Anyone else in Mercy International who was a member of al Qaeda in the past or while in Kenya?

A.   The accountant of Mercy International, too, he was of al Qaeda but in the past his name Abu al Kheryemeni.

Q.   Did you ever see any al Qaeda members in Kenya who had identification cards in the Mercy International Relief agency?

A.   No.

Q.   Did you ever hear whether or not al Qaeda members in Nairobi obtained identification cards from Mercy International Relief agency?

A.   Yes.

Q.   Who did you hear obtained those cards?

A.   I heard that Abu Mohammed Amriki and Bin Laden they had identity card.

616.   MIRA's Kenya Office served as a front for al Qaeda.  Like many Osama bin Laden fronts, MIRA was an operating charity.  The organization may have embarked upon actual charitable work, but only as a cover for their insidious goals.  Following the Embassy bombings, federal authorities raided the offices of MIRA in Kenya on August 21, 1998, after finding MIRA documents in Wadih el-Hage's residence.  At MIRA's office, agents discovered documentary evidence linking it to Osama bin Laden.  Assistant United States Attorney Pat Fitzgerald, who prosecuted the Defendants in the Embassy bombings trial, noted this much when he stated:

These documents show that Mercy International, while it does have legitimate charitable purpose, has other purposes that are contrary to that.

617.   Some of the documents seized belonged to Wadih el-Hage and concerned Abu Ubaidah, a top al Qaeda leader who died in 1996.  Fitzgerald stated:

When they searched Mercy International, they found a number of documents, included among which Wadih El Hage's files and files concerning Abu Ubaidah.

471

618.    Documents found on site indicated that MIRA was smuggling weapons into Kenya from Somalia.  Fitzgerald noted that authorities found a receipt dated July 24, 1998, on the back of which it was stated as related to getting weapons from Somalia.

619.    FBI Agent John Michael Anticev interviewed Mohammed Odeh, who was convicted for his role in the 1998 Embassy bombings.  Mr. Anticev testified that Mohammed Odeh explained to him that MIRA was working for al Qaeda.

> Q. Did Odeh talk to you at all about an entity known as the Mercy International Relief Agency?
> A. Yes.
> Q. What did he tell you about the Mercy International Relief Agency?
> A. That was also -- it was run by a guy in Nairobi named Tawhili, and that organization had ties to Al Qaeda, and Harun and Abu Ubaidah al Banshiri were close to that organization.

620.    The individual referred to above as Tawhili is also known as Sheikh Ahmad Salem Suweidan, one of the FBI's most wanted terrorists.  Therefore, a fugitive al Qaeda member ran MIRA at all relevant points up to the Embassy bombings.  Agent Anticev further related that Harun, Wadih el-Hage's former roommate who also worked for al Qaeda, frequented MIRA, typing information for top al Qaeda leadership:

> Q. Did Odeh describe to you any particular tasks that Harun performed for Al Qaeda?
> A. Yes.  Harun, he said that Harun was a good typist, and, you know, he spent a lot of time at MIRA, the organization we just talked about, and he would type reports for the hierarchy in Al Qaeda.
> Q. And when you said MIRA, MIRA, are you referring to the Mercy International Relief?
> A. Yes, Mercy International Relief.
> Q. Did Odeh indicate to you what was contained in those reports that he typed for the hierarchy?
> A. In those reports they were using certain code words to conceal their true intentions were.

621.    An al Qaeda fugitive was deeply involved in MIRA's Branch in Dublin.  Hamid Aich (or "Aich"), an Algerian who lived in Ireland and volunteered at the MIRA branch in Dublin, was heavily involved in the 2000 bomb plot to destroy Los Angeles International Airport

(LAX).    Shortly before moving to Ireland, Aich was a roommate of Ahmed Ressam, the man currently in jail for his role in the LAX bomb plot.  On December 21, 1999, Aich was arrested by Irish authorities, seizing several personal papers and computer documents, though he was released shortly afterwards, while FBI agents were traveling to interrogate him.  Aich fled and went into hiding, and his current whereabouts are unknown.

622.    Documents found in MIRA's branch in Dublin link the charity to Zacarias Moussaoui.  Travel documents found in a raid at a flat which served as one of MIRA's offices in Dublin are linked to forged documents used by alleged 20th hijacker, Zacarias Moussaoui, criminally charged in the September 11, 2001 attacks.  The documents relate to air travel financed by Mustafa Ahmed al Hisawi, an alleged paymaster of September 11th.  The documents show that Moussaoui's travel was financed by Hisawi.  FBI agents maintain that the evidence found at MIRA's office "proves 'without a shadow of a doubt' that Moussaoui is linked to Osama bin Laden."

623.    Dr. Safar Alhawali, Dr. Soliman Alsaloomi, Dr. Mohamed Said Alghtani (a/k/a Alghatani, Al-Qohtany), Dr. Abdallah Aldomaiji (a/k/a Aldonaji), Abdalaziz Farsi, Faisal Alahmadi, and Waheed Almasry were co-conspirators, aiders and abettors, agents of MIRA and material sponsors of international terrorism.

## Laundering of al Qaeda Funds Through Diamond Businesses

624.    Yassmine Diamonds in Vereffening BVBA is a diamond company registered in Antwerp, Belgium.  Ossailly's relatives are members of the board: Mike Ossailly, or Najla Ossailly, but the company is managed by Samih Ossailly.

625.    Aziz Nassour and Samih Ossailly are both involved in diamonds business in Sierra Leone and Congo on behalf of al Qaeda leaders in order to continue its terrorists operations despite the international agreements to freeze bank accounts linked to al Qaeda.  According to various investigations conducted on this issue, Samih Ossailly set up a safe house

in Monrovia to funnel money from the diamonds fields to international terrorists throughout the world, including al Qaeda.

626.   Echogem NV. was used as a courier to exchange $300,000 for diamonds every week between December 2000 and September 2001.

627.   Since 1998, Ibrahim Bah, through several Lebanese businessmen based in Belgium, has expanded his operations. Official sources identified the key brokers working with Bah as Aziz Nassour and Samih Ossailly.

628.   A large part of these financial operations on behalf of al Qaeda were operated by Aziz Nassour through two companies in Belgium: African International Contact Office BVBA based in Brussels, and Echogem NV based in Antwerp.

629.   Echogem, is based in Antwerp, Belgium. Until recently, the company was headed by Aziz Nassour as Managing director and Francis Gerres as CEO.

630.   African International Contact Office BVBA is based in Brussels, Belgium. The company is chaired by Aziz Nassour as CEO and Ngalula Tseuhi is Managing Director of the company. Aziz Nassour ran his diamond trading activities with his cousin, Samih Ossailly, CEO of a company based in Brussels called Yassmine Diamonds in Vereffening BVBA. Ossailly is currently detained in Belgium, pending trial.

## Additional Defendants

631.   As a result of numerous ongoing civil, criminal, and governmental investigations, upon information and belief, Additional Defendants in this action will be identified as time proceeds. Numerous investigations are ongoing internationally which will result in additional evidence and information on al Qaeda terrorists, their sponsors, co-conspirators, scheme, enterprise, and financial support network.   Additional Defendants 1-5,000 are the as yet unidentified terrorists and sponsors of terrorism that will be identified as investigations proceed and formal discovery commences.  Additional Defendants 1-5,000 will be added to this civil

action as they are identified, pursuant to F.R.C.P. 15(d) and Case Management Order No. 1, dated October 7, 2002. The same set of allegations and general facts al alleged herein apply to the Additional Defendants in terms of their culpability and amenability to suit under the legal theories expressed.

632.    Like the Defendants herein, the Additional Defendants knew or reasonably should have known they were aiding and abetting or providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent persons.

633.    Like the Defendants herein, the Additional Defendants engaged in negligent, grossly negligent, and/or intentional acts and breaches of duty which proximately caused the deaths and injuries of September 11, 2001.   Like the Defendants herein, the Additional Defendants entered into a conspiracy, scheme, and RICO enterprise.

634.    Additional Defendants include terrorist individuals, charities, banks, businesses, associations, entitites, organizations front groups or any other parties as of yet unidentified who engaged in the material sponsorship, aiding and abetting of the September 11, 2001 attacks, Osama bin Laden, al Qaeda and/or international terrorism.   As investigations and formal discovery identify these additional Defendants, they will be added to this action pursuant to Case Management Order No. 1 in this matter.

<u>CLAIMS</u>

## COUNT ONE

## FOREIGN SOVEREIGN IMMUNITIES ACT

635.    Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

636. The actions of the Foreign State Defendant, the Republic of Sudan, and the actions of its agencies and instrumentalities as described herein, forfeited their right to claim immunity of the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and 1605(a)(7). Pursuant to 28 U.S.C. § 1605(a)(7) and Pub. L. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)), all Defendants who are officials, employees or agents of the Foreign State Defendant are individually liable to the Plaintiffs for damages caused by their acts which resulted in the death and injury of the Plaintiffs.

637. The Foreign State Defendant and the actions of its agencies and instrumentalities as described herein, conducted commercial activity that had a direct effect on the United States and is not immune pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1605(a)(2).

638. The Foreign State Defendant and the actions of its agencies and instrumentalities as described herein, is subject to liability from said acts resulting in personal injury and death in the United States caused by the tortious act or omission of the foreign state, officials and employees while acting within the scope of his office and employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

639. The Foreign State Defendant and its agencies and instrumentalities designated as state a sponsors of terrorism as described herein, is subject to liability for said acts and provision of material support for said acts resulting in personal injury and death in the United States as a result of act of torture, extra judicial killing, and aircraft sabotage and have forfeited their right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. § 1605(a)(7).

640. As a direct result and proximate cause of the conduct of the Foreign State Defendant and its agencies, instrumentalities, officials, employees and agents that violated the federal and common laws cited herein, all Plaintiffs suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Foreign State Defendant, the Sudanese agents and Instrumentalities and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs and deter the Defendants from ever again committing such terrorist acts.

## COUNT TWO

## TORTURE VICTIM PROTECTION ACT

641.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

642.    The actions of the Defendants as described herein subjected the Plaintiffs to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)).

643.    In carrying out these acts of extrajudicial killings and injury against the Plaintiffs, the actions of each Defendant were conducted under actual or apparent authority, or under color of law.

644.    As a direct result and proximate cause of the Defendants' violation of the Torture Victim Protection Act, Plaintiffs suffered damages as fully set forth herein.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT THREE

## 18 U.S.C. § 2331 (2331 et. seq.) *et. seq.*

645.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

646.    The Defendants herein engaged in acts of international terrorism; activities that involve violent acts dangerous to human life that are in violation of the criminal law of the United States and appear to be intended to intimidate or coerce a civilian population; to influence policy of a government by intimidation or coercion; or to affect the conduct of a government by assasination.

647.    This activity transcends international boundaries in terms of the means by which they are accomplished, the pesons they appear to intend to intimidate or coerce, or in terms of the locale in which the perpetrators operate or seek asylum. 18 U.S.C. 2331.

648.    Nationals of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover therfold the damages he or she sustains and the costs of suit, including attorneys fees. 18 U.S.C. 2333.

649.    As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries described herein through and by reason of acts of international terrorism, the aiding and abetting international terrorism, conspiring to commit further acts of international terror, engaging in criminal enterprise to promote international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

650.    As set forth above, Defendants aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to Osama bin Laden, al Qaeda,

and international terrorism.   This material support and/or aiding and abetting of acts of international terrorism allowed al Qaeda to carry out the terrorist attacks on the United States on September 11, 2001.

651.   As a result of Defendants' acts in furtherance of international terrorism, including but not limited to financial sponsorship, training, education, travel, logistical or any other material support, all Plaintiffs suffered damages as set forth herein.

652.   Pursuant to 18 U.S.C. §2333, the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

**WHEREFORE,** Plaintiffs, who are nationals of the United States, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of One Trillion Dollars ($1,000,000,000,000), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

<u>COUNT FOUR</u>

## ALIEN TORT CLAIMS ACT

653.   Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

654.   As set forth above, the Defendants, individually, jointly and severally, aided and abetted, sponsored, financial, promoted, fostered, materially supported, or otherwise conspired to proximately cause the death and injury of innocent persons namely the Plaintiffs herein through and by reason of acts of international terrorism   the heinous attacks of September 11, 2001. These terrorist acts constitute a clear violation of the law of nations, otherwise referred to as customary international law, which includes international legal norms prohibiting mass murder,

genocide, torture, air piracy, and terrorism. These international legal norms can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions. and other documents:

(1)    Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)    Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)    Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

(4)    Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5)    Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)    Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(7)    Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(8)    Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(9)    The Universal Declaration of Human Rights, Dec. 10, 1958, G.A. Res. 217A, U.N. Doc. A/810, at 71 (1948);

(10)    The International Covenant of Political and Civil Rights, Dec. 16, 1966, art. 6 (right to life), U.N. Doc. A/6316, 999 U.N.T.S. 171;

(11)    The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(12)    The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(13)   The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

655.   As a result of the Defendants' activities set forth above in violation of the customary international law norms of the law of nations, the Plaintiffs suffered injury and damages as set forth herein.

656.   As a result and proximate cause of the Defendants' sponsorship of terrorism in violation of the law of nations and customary principles of international law, the Plaintiffs suffered injury and damages as set forth herein. Violations of the law of nations of international agreements, and of customary international law entitle non-United States citizens (or "aliens") to civil justice.

657.   Pursuant to 28 U.S.C. §1350, the Plaintiffs' herein who are estates, survivors, heirs and family members of those killed or injured who were non-United States citizens (or "aliens") at the time of their illegal death or injury are entitled to recover damages they have sustained by reason of the Defendants' actions in furtherance of this crime against humanity.

**WHEREFORE**, Plaintiffs who are estates, survivors and heirs of non-United States' citizens (or "aliens), demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in excess of One Trillion Dollars ($1,000,000,000,000), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the victims, but prevent Defendants from ever again committing such terrorist acts.

<u>COUNT FIVE</u>

# WRONGFUL DEATH

658.   Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

659.   Plaintiffs herein bring this consolidated action pursuant to F.R.C.P. 42 for the wrongful death proximately caused by the Defendants engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the mass murder committed by the terrorist attacks acts of September 11, 2001.

660.   Surviving family members or estates of those wrongfully killed are entitled to recover damages from Defendants for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths.   Those responsible for these deaths must be held accountable for the losses incurred.

661.   The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of the Defendants as described herein.

662.   As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

663.   As a direct and proximate result of the Defendants' acts of international terrorism torture, conspiracy and racketeering resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

664.   As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of the Defendants, the Plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

482

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate and deter Defendants from ever again committing acts of international terrorism.

COUNT SIX

## NEGLIGENCE

665.  Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

666.  All Defendants were under a general duty not to injure, murder or cause to be injured or murdered, not to commit or sponsor criminal or tortious acts, endanger lives, foster terror and/or engage in activity that would foreseeably lead to the personal injury and/or death of Plaintiffs. The banking, charity and individual Defendants were under heightened fiduciary duties as public and private trustees and as public servants endowed with the public's trust. Some Defendants undertook duties of care, others were endowed and entrusted duties by virtue of their position of public trust.

667.  Defendants' breach of their duties was a proximate cause of the deaths and injuries at issue and the continuing trauma, loss, and personal injuries inflicted on Plaintiffs. Defendants' actions were negligent and/or grossly negligent.

**WHEREFORE**, Defendants are liable to Plaintiffs in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts such as on September 11, 2001, or similar acts.

483

## COUNT SEVEN

## SURVIVAL

668.     Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

669.     As a result of the intentional, malicious, reckless, conspiratorial, criminal, grossly negligent and negligent acts of Defendants as described herein, those killed on September 11, 2001, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault.  Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, intentionally inflicted physical pain. Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

670.     As a result of Defendants' criminal and tortious conduct, those killed suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial.  Plaintiffs herein seek and are entitled to survival damages for those tortured and killed on September 11, 2001.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

484

COUNT EIGHT

## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

671.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

672.    Defendants intended or knew or should have known, that their conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress; the Defendants intended, knew or should have known that the September 11, 2001, suicide hijackings and intented mass murder would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder on a horrific and massive scale.

673.    The actions of Defendants were unconscionable and done with an intentional, malicious, willful, grossly negligent and/or negligent disregard for the rights and lives of those murdered, those injured, and the surviving loved ones.

674.    As a direct and proximate cause of Defendants' negligent, grossly negligent and/or intentional misconduct and reckless disregard for human life, Plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

675.    The acts and conduct of Defendants was undertaken in an intentional, grossly negligent and/or negligent manner intended to or reasonably forseeable to result in the killing and injuring of innocent people. These criminal and tortuous acts culminated in the murder and

485

maiming of innocent people on September 11, 2001, and beyond, causing continuing, permanent emotional, mental and physical suffering to the families and heirs of the decedents.

676.    Defendants, by engaging in this intentional, unlawful conduct, grossly negligently, and/or intentionally inflicted emotional distress upon the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing acts of international terrorism.

COUNT NINE

# CONSPIRACY

677.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

678.    As set forth above, the Defendants, unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate, cooperate and engage in unlawful and tortious acts pursuant to a common course of conduct, namely the promotion and sponsoring of international terrorism, resulting in the death and injury of Plaintiffs.

679.    As set forth above, the Defendants conspired with, encouraged, furthered and agreed to provide material support, funding, sponsorship, aiding and abetting and/or other material resources to al Qaeda, Osama bin Laden, and the ends of international terrorism in furtherance of this conspiracy.

680.    As set in detail herein, the Defendants engaged in a commonly motivated, organized, concerted and conspirational acts, efforts, transactions, material support, and activities

designed, intended, and forseeably to cause acts of international terrorism including the terrorist attack on the United States, its citizens and society on September 11, 2001.  Co-conspirators herein continue in their quest to attack the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this concert of action, agreement, enterprise, civil and criminal conspiracy and common scheme.

681.    Defendants' concert of action, scheme, enterprise and conspiracy to support and promote Osama bin Laden, al Qaeda and international terrorism was a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs.

682.    As a result of Defendants' concert of action and conspiracy to further international terrorism, Plaintiffs have suffered damages as will be shown at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again commit acts of international terrorism.

<u>COUNT TEN</u>

## AIDING AND ABETTING

683.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

684.    As set forth above, Defendants knowingly and substantially assisted in the sponsorship of Osama bin Laden, al Qaeda, international terrorism and the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs herein.

685.    At the time of such aiding and abetting, Defendants knew or should have known that its role was part of an overall and ongoing illegal, criminal and/or tortious activity.

686.    As set forth above, the Defendants aided and abetted in concerted efforts, transactions, acts and activities designed to cause the attacks of September 11, 2001, on the United States, its citizens, foreign citizens, its liberties and freedoms.

687.    That Defendants' aiding and abetting of international terrorism through material sponsorship was a proximate cause of the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs.

688.    As a direct and proximate result of the Defendants' aiding and abetting activities, Plaintiffs have suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing acts of international terrorism.

<u>COUNT ELEVEN</u>

## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. § 1962(a)

689.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

690.    Non-Sovereign Defendants are each "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

691.   The Defendant charities, banks, businesses, terrorists, terrorist cells, and other individuals and entities comprise and are each an "enterprise" within the meaning of RICO, the activities of which affect intrastate and foreign commerce.

692.   By virtue of the predicate criminal and tortuous acts as described in this Complaint, including but not limited to, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, mail and wire fraud, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and/or aiding and assisting illegal aliens, terrorists and terrorism sponsors in entering the United States.

693.   Osama bin Laden and al Qaeda, with the material support of Defendants herein, transferred, received, supplied, promoted, trained, financed, both directly and indirectly, from a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators, used and invested, both directly and indirectly, the income and the proceeds of such acts, in furtherance of and in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(a), 18 U.S.C. § 1961 (1); inclusion of acts of terrorism as racketeering activity, H.R. 3162 – 11, USA Patriots Act 2001, § 813.

694.   Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961 *et seq.*, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.   This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "al Qaeda Enterprise."   The al Qaeda Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

695.    Defendants herein and others, being persons employed by and associated with an enterprise, namely the al Qaeda Enterprise, which engaged in and the activities of which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate Title 18, United States Code, Section 1962(a), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

    (a)   18 U.S.C. § 1341 (mail fraud);
    (b)   18 U.S.C. § 1343 (wire fraud);
    (c)   18 U.S.C. § 1503 (obstruction of justice);
    (d)   18 U.S.C. § 1956 (money laundering); and
    (e)   18 U.S.C. § 2339A (material support to organizations engaged in violent activities).

696.    It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the enterprise.  It was part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

697.    It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy, and in violation of Title 18, United States Code, Section 1962(a).

698.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000), treble damages, plus interest, costs, and such other monetary and

equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## COUNT TWELVE

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(c)

699.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

700.     By virtue of the criminal and tortuous acts as described herein, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, mail and wire fraud, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction improperly derived from unlawful and tortuous activity.  The use of interstate commerce, interstate transportation of terrorist property, bringing in and harboring illegal aliens, material sponsorship of, aiding and/or assisting illegal aliens, terrorists and terrorism sponsors in entering the United States.

701.     Osama bin Laden and al Qaeda, with the material support of Defendants herein, transferred, received, supplied, promoted, trained, financed, and engaged in both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, and used and invested, both directly and indirectly, the income and the proceeds of such acts in establishing and furthering the operation of terrorist enterprises, in violation of 18 U.S.C. § 1962(c); 18 U.S.C. § 1961(1); inclusion of acts of terrorism as racketeering activity, USA Patriots Act 2001, § 813.

702.     Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose and constituted an "enterprise" as

that term is defined in Title 18, United States Code, Section 1961 *et seq.*, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce. This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "al Qaeda Enterprise." The al Qaeda Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

703.    Defendants herein and others, being persons employed by and associated with an enterprise, namely the al Qaeda Enterprise, which engaged in and the activities of which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

> (a)  18 U.S.C. § 1341 (mail fraud);
> (b)  18 U.S.C. § 1343 (wire fraud);
> (c)  18 U.S.C. § 1503 (obstruction of justice);
> (d)  18 U.S.C. § 1956 (money laundering); and
> (e)  18 U.S.C.§ 2339A (material support to organizations engaged in violent activities).

704.    It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the enterprise. It was part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

705.    It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy, and in violation of Title 18, United States Code, § 1962(c).

706.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c),

Plaintiffs suffered the loss of valuable property, financial services and support, and suffered

other pecuniary damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants,

jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars

($1,000,000,000,000), treble damages, plus interest, costs, and such other monetary and

equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever

again committing such terrorist acts.

## COUNT THIRTEEN

## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(d)

707.    Plaintiffs incorporate herein by reference the averments contained in all preceding

paragraphs.

708.    By virtue of the criminal and tortuous acts as described herein, including without

limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use

and misuse of passports, mail and wire fraud, fraud and misuse of visas, laundering of monetary

instruments, engaging in monetary transaction improperly derived from unlawful and tortuous

activity.  The use of interstate commerce facilities in murder-for-hire, interstate transportation of

terrorist property, bringing in and harboring illegal aliens, and aiding and/or assisting illegal

aliens, material sponsorship of terrorists and terrorism sponsors in entering the United States.

709.    Osama bin Laden and al Qaeda, with the material support of Defendants herein,

transferred, received, supplied, promoted, trained, financed, both directly and indirectly, a pattern

of racketeering activity in which Defendants participated as principals, agents and co-

conspirators in an enterprise, used and invested, both directly and indirectly, the income and the proceeds of such acts, in establishing and furthering the operation of terrorist enterprises, in violation of 18 U.S.C. § 1962(d); 18 U.S.C. § 1961(1); inclusion of acts of terrorism as racketeering activity, USA Patriots Act 2001, § 813.

710.   Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961 *et seq.*, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.   This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "al Qaeda Enterprise."  The al Qaeda Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

711.   Defendants herein and others, being persons employed by and associated with an enterprise, namely the al Qaeda Enterprise, which engaged in and the activities of which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate Title 18, United States Code, Section 1962(d), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

(a)   18 U.S.C. § 1341 (mail fraud);
(b)   18 U.S.C. § 1343 (wire fraud);
(c)   18 U.S.C. § 1503 (obstruction of justice);
(d)   18 U.S.C. § 1956 (money laundering); and
(e)   18 U.S.C.§ 2339A (material support to organizations engaged in violent activities).

712.   It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the enterprise.   It was part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a

scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

713.    It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy, and in violation of Title 18, United States Code, § 1962(d).

714.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000), treble damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

<u>COUNT FOURTEEN</u>

## PUNITIVE DAMAGES

715.    Plaintiffs incorporate herein by reference the averments contained in all the preceding paragraphs.

716.    The actions of the Defendants, acting in concert or otherwise conspiring to carry out, aid and abet these unlawful objectives of terror, were intentional, malicious, unconscionable, and in reckless disregard of the rights and safety of all Plaintiffs.    Defendants, acting individually, jointly, and/or severally intended to carry out actions that would brutalize or kill the Plaintiffs.

717.   As a result of their intentional, malicious, outrageous, willful, reckless conduct, the Defendants are individually, jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

COUNT FIFTEEN

## PUNITIVE DAMAGES – AGENCIES AND INSTRUMENTALITIES OF THE FOREIGN STATE DEFENDANT

718.   Plaintiffs incorporate herein by reference the averments contained in all the preceding paragraphs.

719.   The Foreign State Defendant and its agencies and instrumentalities, directly or indirectly caused, contributed to, supported, conspired to cause, aided and abetted the commission of the terrorist acts that resulted in the deaths and injuries as described herein.

720.   The actions of the agencies and instrumentalities of the Foreign State Defendant, acting individually and/or in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, unconscionable and reckless disregard for human life or the human and legal rights of all Plaintiffs.   These agencies and instrumentalities, acting individually and jointly, engaging in material sponsorship, aiding and abetting, intended to engage in, promote, or otherwise sponsor and support terrorism.

721.   Pursuant to 28 U.S.C.A. §1606, which specifically authorizes a claim for punitive damages arising from state sponsored terrorist acts actionable under 28 U.S.C. § 1605 (a)(7), and for the reasons stated herein, the agencies and instrumentalities of The Republic of Sudan are

jointly and severally liable to all Plaintiffs for punitive damages, pursuant to Pub.L. 104-208, Div. A, Title I, §101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.).

722.    Defendants who are officials, employees or agents of the Foreign State Defendant, the Sudanese Agencies and Instrumentalities, are also individually liable to Plaintiffs for punitive damages caused by the acts and conduct which resulted in the deaths and/or injuries of the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Foreign State Defendants, the Sudanese Agencies and Instrumentalities (and any other State sponsors of terrorism who are named herein in the future), and each of their officials, employees or agents, jointly, severally, and/or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

### Common Issues Requiring Consolidation

723.    Under Federal Rule of Civil Procedure 42, Plaintiffs respectfully as this Court to certify common questions of law and fact to be tried as to all Defendants. Plaintiffs maintain that consolidation under Rule 42 a proper and efficient means of proceeding to avoid unnecessary costs or delay. These common legal and factual questions include, but are not limited to, the following:

> (a)  Whether Defendants engaged in the sponsorship, financial or other material support, facilitation, encouragement, or any other means of aiding and abetting or participating in international terrorism, or conspiring to promote, aid and abet or materially sponsor international terrorism, as that term is defined under United States or international law;
>
> (b)  Whether Defendants are liable to Plaintiffs for wrongful death, survival, and/or personal injury pursuant to the Foreign Sovereign Immunities Act, the Alien Tort Act, the Torture Victim Protection Act, 18 U.S.C. § 2331 *et. seq.*, international law or the law of nations;

(c) Whether the acts and conduct of the Defendants was a proximate cause of the terrorist attacks of September 11, 2001, and the resulting damage to Plaintiffs;

(d) Whether the Defendants have engaged in an enterprise or scheme in violation of RICO, and if so, whether Plaintiffs are entitled to recover under this statute as amended by the USA Patriots Act, Section 813; *Inclusion of Acts of Terrorism as Racketeering Activity;*

(e) Whether Plaintiffs are entitled to the assets of certain Defendants that have been designated as terrorist entities and had their assets frozen by the United States Department of Treasury in the event of a judgment;

(f) Whether Plaintiffs are entitled to the assets of certain Defendants that have been frozen by foreign nations in order to satisfy a judgment;

(g) Whether the Plaintiffs can institute pre-judgment attachments, notices of liens, or take away other equitable preemptive steps to monitor, prevent or track fraudulent asset transfer to avoid judgment;

(h) Whether the Plaintiffs are entitled to treble damages;

(i) Whether Defendants are liable to Plaintiffs for punitive damages, and if so, in what amount;

(j) What is the proper measure of compensatory damages for Plaintiffs; and

(k) What equitable relief or other relief is available to Plaintiffs herein, who ultimately seek accountability above all else.

**WHEREFORE**, Plaintiffs request that this Honorable Court facilitate discovery in this matter, determine and try the common legal and factual issues, and award Plaintiffs damages on each of the causes of action stated above plus interest, costs, expenses, attorney and expert fees, and such other monetary and equitable relief as this Honorable Court deems appropriate.

# JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated: New York, NY
       September 5, 2003

Respectfully submitted,

HANLY & CONROY LLP

By: _____

    Paul J. Hanly, Jr. (PH-5486)
    Jayne Conroy (JC-8611)
    Andrea Bierstein (AB-4618)
415 Madison Avenue
New York, NY 10017-1111
Telephone: (212) 401-7600

      -and-


MOTLEY RICE LLC
Ronald L. Motley (SC Bar No. 4123)
Joseph F. Rice (SC Bar No. 4710)
Jodi Westbrook Flowers (SC Bar No. 66300)
Donald A. Migliori (RI Bar No. 4936; MA Bar No.
    567562; and MN Bar No. 0245951)
Jeffrey Thompson (TX Bar No. 00785101)
Michael E. Elsner (NY & VA Bar Nos. ME-8337)
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

      -and-


Allan Gerson (DC Bar No. 327494)
4221 Lenore Lane
Washington, DC 20008
Telephone: (202) 966-8557

      -and-


Harry Huge (D.C. Bar #55640)
Harry Huge Law Firm, LLP
Market Square North
401 Ninth Street, N.W., Suite 450

Washington, D.C. 20004
Telephone: (202) 824-6046

-and-

William N. Riley (IN Bar No. 4941-49)
Mark K. Dudley (IN Bar No. 15418-49)
Amy Ficklin DeBrota (IN Bar No. 17294-49)
3815 River Crossing Parkway, Suite 340
Indianapolis, Indiana 46240
Telephone: (317) 848-7939

-and-

Jack Cordray (SC Bar No. 1400)
CORDRAY LAW FIRM
40 Calhoun Street
Charleston, SC 29401
Telephone: (843) 577-9761

-and-

Chip Robertson
Mary Winter
BARTIMUS, FRICKLETON, ROBERTSON &
OBETZ
200 Madison Avenue, Suite 1000
Jefferson City, MO 65101
Telephone: (573) 230-4665

-and-

William H. Narwold
Joel Casey
Ingrid Moll
CUMMINGS & LOCKWOOD
CityPlace I
185 Asylum Street, 36th Floor
Hartford, Connecticut 06103
Telephone: (860) 275-6700

-and-

Don Howarth (CA Bar No. 53783)
Suzelle M. Smith (CA Bar No. 113992)
Robert D. Brain (CA Bar No. 98815)
HOWARTH & SMITH
800 Wilshire Boulevard, Suite 750
Los Angeles, CA 90017

500

Telephone:  (213) 955-9400

-and-

Michael N. Block
SULLIVAN, PAPAIN, BLOCK, MCGRATH
        & CANNAVO, P.C.
120 Broadway Avenue, 18th Floor
New York City, NY 10271
Telephone:  (212) 732-9000

-and-

John D'Amato (NY Bar No. JD-9041)
Guy Molinari  (NY Bar No. GM-2155)
RUSSO, SCARNARDELLA & D'AMATO, P.C.
1010 Forest Avenue
Staten Island, NY 10310
Telephone:  (718) 442-0900

-and-

Kenneth Sacks
SACKS AND SACKS, LLP
150 Broadway, 4th Floor
New York, NY 10038
Telephone:  (212) 964-5570

-and-

Clare Sproule
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177-1211
Telephone:  (212) 351-4500

-and-

Robert Conason (NY Bar No. RC2605)
GAIR, GAIR, CONASON, STEIGMAN
        & MACKAUF
80 Pine Street
New York City, NY 10005
Telephone:  (212) 943-1090

501

-and-

Anthony M. Sellitto, Jr.
OLIVER & SELLITTO
205 Bond Street
Asbury Park, NJ 07712
Telephone (732) 988-1500

-and-

Sanford Rubenstein  (NY Bar No. SR-4488)
RUBENSTEIN & RYNECKI
16 Court Street
Brooklyn, NY 11241
Telephone:  (718) 522-1020

-and-

Vincent F. Pitta  (NY Bar No. VP1435)
Milton Mollen (NY Bar No. MM1504)
HERRICK, FEINSTEIN, LLP
2 Park Avenue
New York City, NY 10016
Telephone:  (212) 592-1400

Attorneys for Plaintiffs